No. 24-6008

# In the United States Court of Appeals for the Ninth Circuit

DAYMON JOHNSON,

*Plaintiff-Appellant,*

v.

STEVE WATKIN, et al.,

*Defendants-Appellees.*

Appeal from an order of the United States District Court for the Eastern District of California, The Hon. Kirk E. Sheriff (Dist. Ct. No. 1:23-cv-00848-KES-CDB)

APPELLANT'S BRIEF

Alan Gura
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., N.W.
Suite 801
Washington, DC 20036
202.301.3300
agura@ifs.org

October 30, 2024                    *Counsel for Appellant*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iv

INTRODUCTION.......................................................................... 1

STATEMENT OF JURISDICTION ...................................................... 4

STATEMENT OF ISSUES ............................................................... 5

STATEMENT OF ADDENDUM.......................................................... 6

STATEMENT OF THE CASE............................................................ 6

   A. The regulatory regime........................................................ 6

     1. Grounds for terminating community college faculty ................. 6

     2. KCCD's civility policy .................................................. 7

     3. The DEIA/anti-racism mandate ....................................... 7

   B. The ideological divide at Bakersfield College............................. 13

   C. Bakersfield College investigates and threatens Professor
     Johnson for disagreeing with a colleague on Facebook................. 15

   D. Bakersfield College punishes professors for speaking ................. 16

   E. Defendants' adoption and enforcement of an official ideology
     chills Professor Johnson's speech, and compels him to speak
     contrary to his conscience .............................................. 21

   F. Procedural history.......................................................... 29

     1. Report and recommendation that defendants be enjoined....... 30

     2. The district court's order ............................................. 32

SUMMARY OF THE ARGUMENT ................................................... 37

STANDARD OF REVIEW ............................................................... 39

ARGUMENT ................................................................................... 39

I.    Johnson has standing .............................................................. 39

      A.    Johnson adequately described his intent to speak and
            teach, as well as his intent to refrain from advancing
            DEIA and anti-racist principles ........................................... 44

      B.    The challenged provisions more than "arguably" bar, and
            compel, Johnson's speech ...................................................... 50

            1.    The Education Code and BP 3050 .............................. 50

            2.    DEIA performance evaluation regulations .................. 51

            3.    DEIA/anti-racism teaching mandate ........................... 54

      C.    Johnson faces a realistic danger of termination if he
            speaks freely and remains true to his conscience ............... 55

      D.    Defendants cause Johnson's injuries, which the Court
            can redress ............................................................................. 56

II.   Johnson is entitled to a preliminary injunction ...................... 57

      A.    The First Amendment bars defendants from
            compelling Professor Johnson to conform his speech
            to their ideology .................................................................... 58

            1.    The First Amendment bars defendants from
                  punishing Professor Johnson for expressing
                  his views ..................................................................... 59

            2.    Defendants' "civility" policy is vague ......................... 64

3.    The First Amendment bars defendants from compelling Professor Johnson to think and speak in accordance with their ideology ................................. 66

B.    Johnson suffers irreparable harm ......................................... 69

C.    The balance of equities, and the public interest, favor Johnson................................................................................. 70

CONCLUSION ..................................................................................... 70

STATEMENT OF RELATED CASES ................................................ 71

CERTIFICATE OF COMPLIANCE ................................................... 72

ADDENDUM

TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis*,
　600 U.S. 570 (2023) ............................................................... 44, 59, 67

*Am. Bev. Ass'n v. City & Cty. of San Francisco*,
　916 F.3d 749 (9th Cir. 2019) (en banc) ................................... 39

*Ariz. All. for Retired Ams. v. Mayes*, No. 22-16490,
　2024 U.S. App. LEXIS 23963 (9th Cir. Sept. 20, 2024).............. passim

*Ariz. Democratic Party v. Hobbs*,
　976 F.3d 1081 (9th Cir. 2020) .................................................. 58

*Ariz. Dream Act Coal. v. Brewer*,
　855 F.3d 957 (9th Cir. 2017) .................................................... 70

*Arnold v. IBM Corp.*,
　637 F.2d 1350 (9th Cir. 1981) .................................................. 56

*Associated Press v. Otter*,
　682 F.3d 821 (9th Cir. 2012) .................................................... 70

*Boardman v. Inslee*,
　978 F.3d 1092, 1109 (9th Cir. 2020)......................................... 67

*Bolden-Hardge v. Off. of the Cal. State Controller*,
　63 F.4th 1215 (9th Cir. 2023).................................................... 49

*Borough of Duryea v. Guarnieri*,
　564 U.S. 379, 397 (2011) .......................................................... 60

*Bridenbaugh v. Freeman-Wilson*,
　227 F.3d 848 (7th Cir. 2000) .................................................... 53

iv

*BSA v. Dale,*
    530 U.S. 640 (2000) ................................................................ 59

*Cal. Pro-Life Council, Inc. v. Getman,*
    328 F.3d 1088 (9th Cir. 2003) .................................. 40, 42

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ............................................ 53

*CTIA - The Wireless Ass'n v. City of Berkeley,*
    928 F.3d 832 (9th Cir. 2019) ............................................ 69

*Demers v. Austin,*
    746 F.3d 402 (9th Cir. 2014) .................................. passim

*East Bay Sanctuary Covenant v. Garland,*
    994 F.3d 962 (9th Cir. 2021) ............................................ 58

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................... 69

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ........................................................... 60

*Garrett v. Hine,*
    No. 1:21-cv-00845 (E.D. Cal. 2021) ............................... 17

*Green v. Miss USA, LLC,*
    52 F.4th 773 (9th Cir. 2022) ........................................... 59

*Hernandez v. City of Phoenix,*
    43 F.4th 966 (9th Cir. 2022) .................................... 61, 64

*Hernandez v. Sessions,*
    872 F.3d 976 (9th Cir. 2017) ........................................... 70

*In re Johnson,*
    No. 24-5446 (filed Sept. 5, 2024) ................................... 32

*Isaacson v. Mayes,*
    84 F.4th 1089 (9th Cir. 2023) .................................................. 39, 40, 43

*Janus v. AFSCME, Council 31,*
    585 U.S. 878 (2018) ........................................................ 59, 66, 68, 69

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967) ............................................................... 63, 64

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013) ...................................................................... 67

*Lane v. Franks,*
    573 U.S. 228 (2014) ...................................................................... 60

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) ........................................................ 58

*Lopez v. Candaele,*
    630 F.3d 775 (9th Cir. 2010) ........................................... 41, 42, 44, 50

*Merritt v. Mackey,*
    827 F.2d 1368 (9th Cir. 1987) ....................................................... 57

*Minnesota Voters Alliance v. Mansky,*
    585 U.S. 1 (2018) .......................................................................... 63

*Moms for Liberty v. Brevard Pub. Sch.,* No. 23-10656,
    2024 U.S. App. LEXIS 25394 (11th Cir. Oct. 8, 2024) ........................ 44

*Monell v. Dep't of Soc. Svcs.,*
    436 U.S. 658 (1978) ...................................................................... 30

*Peace Ranch, LLC v. Bonta,*
    93 F.4th 482 (9th Cir. 2024) ................................................ 42, 46, 53

*Pickering v. Bd. of Ed.*,
    391 U.S. 563 (1968) .................................................................. 61, 62

*Rodriguez v. Maricopa County Cmty. College Dist.*,
    605 F.3d 703 (9th Cir. 2009) ............................................... 64

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ............................................. 70

*Seattle Pac. Univ. v. Ferguson*,
    104 F.4th 50 (9th Cir. 2024) ........................................ 41, 45

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ........................................... 63

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...................................................... 40, 44

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957) ............................................................ 64

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................ 63

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) (en banc) ........................... 41

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ........................... 42, 43, 45, 50

*United States v. Nat'l Treasury Emps. Union (NTEU)*,
    513 U.S. 454 (1995) ............................................................ 66

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
    425 U.S. 748 (1976) ............................................................ 53

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943) ............................................................ 58

*Waln v. Dysart Sch. Dist.*,
   54 F.4th 1152 (9th Cir. 2022) ...................................................... 59, 63

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2020) ........................................................... 43

*Wolfson v. Brammer*,
   616 F.3d 1045 (9th Cir. 2010) ..................................................... 40, 57

*Wooley v. Maynard*,
   430 U.S. 705 (1977) ............................................................................ 67

**Statutes, Rules, Regulations, and Policies**

28 U.S.C. § 1292(a)(1) ................................................................... 4, 41

28 U.S.C. § 1331 ............................................................................... 4

Cal. Code Regs. tit. 5, § 51200 ................................................... 8, 35

Cal. Code Regs. tit. 5, § 51201(a) ................................................... 8

Cal. Code Regs. tit. 5, § 51201(b) ............................................... 8, 52

Cal. Code Regs. tit. 5, § 53425 ................................................. 35, 51

Cal. Code Regs. tit. 5, § 53601 ...................................................... 35

Cal. Code Regs. tit. 5, § 53601(a) ................................................. 10

Cal. Code Regs. tit. 5, § 53601(b). ............................................... 10

Cal. Code Regs. tit. 5, § 53602 ................................................. 36, 55

Cal. Code Regs. tit. 5, § 53602(a) ......................................... 11, 51, 54

Cal. Code Regs. tit. 5, § 53602(b) ............................................... 9, 52

Cal. Code Regs. tit. 5, § 53602(c)(1) ...................................... 11

Cal. Code Regs. tit. 5, § 53605 ............................................... 36

Cal. Code Regs. tit. 5, § 53605(a) ...................................... 9, 54

Cal. Educ. Code § 70902(b)(4) ...........................................56

Cal. Educ. Code § 87732 ................................................. 6, 47

Cal. Educ. Code § 87732(a) .................................................21

Cal. Educ. Code § 87732(b) .................................................21

Cal. Educ. Code § 87732(c) .................................................21

Cal. Educ. Code § 87732(d) .................................................21

Cal. Educ. Code § 87732(f) ............................................ 21, 55

Cal. Educ. Code § 87734 .......................................................6

Cal. Educ. Code § 87735 ............................................ 7, 21, 47

Fed. R. App. P. 4(a)(1)(A) ....................................................4

KCCD Board Policy 3050 .......................................... passim

KCCD Board Policy 7360 ......................................................7

**Other Authorities**

Bakersfield College, Equal Opportunity & Diversity Advisory
  Committee, https://perma.cc/BWR6-2U79...........................................13

California Community Colleges, *Diversity, Equity, Inclusion, and
  Accessibility (DEIA)*, https://perma.cc/UXD8-RNMC .........................10

*Diversity, Equity and Inclusion Glossary of Terms*, California
  Community Colleges Chancellor's Office,
  https://perma.cc/T22V-V866.................................................................8

Education Law of the People's Republic of China, ch. 1, art. 3 (Sept. 1,
  1995), https://perma.cc/8GHT-B45L .....................................................63

Helen Acosta, *District EEO Advisory Committee Report to
  Bakersfield College Academic Senate*, Apr. 17, 2024,
  https://perma.cc/CST2-6PM2 ..............................................................10

Michael Carroll, *Kern Community College District agrees to $2.4 million
  settlement with professor in retaliation case*, Southern California
  Record, Aug. 22, 2024, https://perma.cc/NL6Q-TNUU.......................21

INTRODUCTION

Bakersfield College investigates, punishes, and fires professors for their political expression. So alien are concepts of free speech and academic freedom to college officials that the President of the school's community college district board felt comfortable publicly comparing dissenting faculty to defective cattle "that we have to continue to cull." ER-61. "Got them in my livestock operation and that's why we put a rope on some of them and take them to the slaughterhouse." *Id*.

School officials have investigated History Professor Daymon Johnson for his private political speech and warned that they could investigate him again. Johnson heads the faculty's dissident Renegade Institute for Liberty ("RIFL") because officials fired his immediate predecessor as RIFL Faculty Lead, Professor Matthew Garrett, for his protected First Amendment political speech. Among Garrett's speech offenses: writing newspaper editorials, giving media interviews about political topics, and, like the activity for which officials investigated Johnson, discussing politics on social media. Some of the Facebook posts for which officials punished Garrett were actually Johnson's.

1

Making matters worse, the Chancellor of California's community college system now maintains a pervasive set of "competencies and criteria" enforcing an official political ideology—diversity, equity, inclusion, and accessibility ("DEIA"), which includes "anti-racism"— that faculty must incorporate into every facet of their professional and even personal life. Professors must teach the official ideology, engage in self-reflection about their commitment to the official ideology, produce research supporting the official ideology, promote the hiring of colleagues who would advance the official ideology, and so on. Bakersfield College officials, ever-enthusiastic adherents of this program, are now charged with evaluating Johnson's performance according to his level of commitment to DEIA and anti-racism ideology, which is zero.

Fearing additional reprisals for his political speech, unable to continue participating on school committees that now require DEIA compliance, and unwilling to teach or otherwise kowtow to the state's official political ideology—despite knowing that his performance evaluations and thus continued employment hinge on doing exactly that—Johnson sought relief securing his First Amendment rights. In an

exhaustive, 107-paragraph declaration spanning 29 pages, Johnson detailed not only how the school investigated him for his political speech and terminated his colleague for speaking similarly, but also the speech he refrains from expressing and the speech he is compelled to make in violation of his conscience.

The magistrate judge issued a report and recommendation explaining why Johnson is entitled to a preliminary injunction on nearly all his claims. But Johnson's preliminary injunction motion languished, remaining undecided for well over a year. When the district court finally turned to the motion (after Johnson petitioned for mandamus relief), it claimed that Johnson failed to plead highly specific details of his planned speech which are either readily inferable, unnecessary, or in some instances, set forth in Johnson's declaration. The court also found that Johnson's speech isn't proscribed by the challenged provisions (that defendants invoked when punishing speech), and failed to acknowledge the threats to Johnson should he speak freely.

And although it credited Johnson's refusal to teach, promote, and internalize the state's official political ideology, the district court

misread the law and thus failed to acknowledge that Johnson is, in fact, compelled to speak contrary to his conscience. Accordingly, it dismissed the complaint for lack of standing, albeit with leave to amend, and denied Johnson's preliminary injunction motion. The case is stayed below pending this appeal's outcome.

The district court erred. Its order should be vacated, and the case remanded with instructions to grant Johnson's motion for a preliminary injunction.

## STATEMENT OF JURISDICTION

(a) The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as the dispute arises under the United States Constitution and 42 U.S.C. § 1983.

(b) Plaintiff appeals from the district court's order denying his motion for a preliminary injunction. ER-52. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(1).

(c) The order appealed from was entered on September 23, 2024. Plaintiff noticed his appeal from that order that day. The appeal is timely pursuant to Fed. R. App. P. 4(a)(1)(A).

STATEMENT OF ISSUES

1.  Whether the record, including Professor Johnson's 29 page, 107 paragraph declaration, adequately details for standing purposes the First Amendment-protected speech that Johnson refrains from expressing, and the speech he is compelled to make contrary to his conscience and in derogation of his right to academic freedom.

2.  Whether defendants' application of California Education Code provisions governing faculty termination, defendants' civility policy, and California's DEIA mandates, reach Johnson's First Amendment-protected speech.

3.  Whether Johnson reasonably fears further reprisals and termination of his employment should he express his views and fail to advance official state ideology as required;

4.  Whether the First Amendment bars defendants from punishing Johnson for expressing his views, and from compelling him to teach and promote their ideology contrary to his conscience; and

5.  Whether Johnson is entitled to a preliminary injunction securing his right to free political speech and academic freedom against

defendants' application of the Education Code, civility policy, and state DEIA mandates.

## STATEMENT OF ADDENDUM

Pertinent constitutional provisions and statutes are included in an addendum below.

## STATEMENT OF THE CASE

A.   The regulatory regime

   *1. Grounds for terminating community college faculty*

California community colleges can only fire a professor for certain reasons, including:

   (a) Immoral or unprofessional conduct;

   (b) Dishonesty;

   (c) Unsatisfactory performance;

   (d) Evident unfitness for service; . . . [and]

   (f) Persistent violation of, or refusal to obey . . . reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her.

Cal. Educ. Code § 87732.

Faculty charged with "unprofessional conduct" or "unsatisfactory performance" are provided 90 days' notice to reform. *Id.* § 87734. But

6

officials may immediately suspend and terminate faculty within 30 days, unless the employee requests a hearing, upon receiving or formulating charges alleging "immoral conduct" or "willful refusal to perform regular assignments without reasonable cause" per the employer's rules and regulations. *Id.* § 87735. The trustees of the Kern Community College District ("KCCD"), which operates Bakersfield College, will not penalize or dismiss faculty absent its Chancellor's recommendation. *See* KCCD Board Policy 7360.

### 2. KCCD's Civility Policy

KCCD Board Policy 3050 ("BP 3050") "requires that [faculty] conduct [them]selves with civility in all circumstances of [their] professional lives." It "encourages" free expression, but "expect[s] all expressions of content to be conducted in a manner respectful of persons." The policy also claims that KCCD "do[es] not participate in or accept, condone, or tolerate physical or verbal forms of aggression, threat, harassment, ridicule, or intimidation." These terms are undefined.

### 3. The DEIA/anti-racism mandate

California's community college system, of which KCCD is a constituent part, "embrace[s] diversity." Cal. Code Regs. tit. 5, §

7

51201(a).[1] This commitment "guide[s] the administration of all programs in the California Community Colleges, consistent with all applicable state and federal laws and regulations." Section 51200.

"Embracing diversity means that we must intentionally practice . . . anti-racism . . . ." Section 51201(b). An "anti-racist" is defined as one who "understand[s] that racism is pervasive and has been embedded into all societal structures." *Diversity, Equity and Inclusion Glossary of Terms*, California Community Colleges Chancellor's Office, https://perma.cc/T22V-V866 at 1 (last visited Oct. 26, 2024). Anti-racists "challenge the values, structures, policies, and behaviors that perpetuate systemic racism" and are "also willing to admit the times in which they have been racist." *Id.* "Practicing antiracism requires constantly identifying, challenging, and upending existing racist policies to replace them with antiracist policies that foster equity between racial groups." *Id.*

Accordingly, "embracing diversity" requires "acknowledg[ment] that institutional racism, discrimination, and biases exist," and a

---

[1] All further statutory citations are to Title 5, California Code of Regulations, unless otherwise noted.

8

commitment to "eradicat[ing] these from our system," to "strive to eliminate those barriers to equity." Section 51201(c). It requires "that we act deliberately to create a safe, inclusive, and anti-racist environment . . . ." *Id.* "District employees must have or establish proficiency in DEIA-related performance to teach, work, or lead within California community colleges." Section 53602(b).

That includes what and how professors teach: "Faculty members *shall* employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles . . . ." Section 53605(a) (emphasis added).

Community colleges must assess a professor's DEIA compliance in evaluating faculty performance. "To advance DEIA principles in community college employment, districts *shall*:

(1) include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees;

(2) ensure that evaluators have a consistent understanding of how to evaluate employees on DEIA competencies and criteria;

(3) set clear expectations regarding employee performance related to DEIA principles . . . ;

(4) place significant emphasis on DEIA competencies in employee evaluation and tenure review processes, [and]

9

(6) ensure an evaluation process that provides employees an opportunity to demonstrate their understanding of DEIA and anti-racist competencies."

Section 53602(c) (emphasis added).

The Chancellor of California Community Colleges, currently defendant-appellee Christian, "shall adopt and publish guidance describing DEIA competencies and criteria," Section 53601(a), which "shall be used as a reference for locally developed minimum standards in community college district performance evaluations of employees and faculty tenure reviews," Section 53601(b).

The Chancellor's Office is equipping districts and colleges with the tools and support they need to create equity-centered, anti-racist policies and practices, including: Embedding DEIA competencies and criteria into employee evaluations and tenure review processes . . . .

California Community Colleges, *Diversity, Equity, Inclusion, and Accessibility (DEIA)*, https://perma.cc/UXD8-RNMC (last visited Oct. 25, 2024). Apparently, KCCD has not yet issued local DEIA standards because it perceived the magistrate judge's report and recommendation in this case, *infra* at 30-32, as effectively staying those efforts. *See* Helen Acosta, *District EEO Advisory Committee Report to Bakersfield College Academic Senate*, Apr. 17, 2024, https://perma.cc/CST2-6PM2 (last visited Oct. 24, 2024).

But Bakersfield College need not wait for "locally developed minimum standards" to evaluate a professor's DEIA compliance. Defendants may use either "the locally-developed DEIA competencies *or* those published by the Chancellor," Section 53602(a) (emphasis added), when deciding whether a professor merits retention. Notably, while Section 53602(c)(1) commands that community college districts "shall" "include DEIA competencies and criteria as a minimum standard for evaluating the performance of all employees," consistent with Section 53602(a) it does not specify *which* competencies to apply—the state Chancellor's, or the locally-developed ones based on them.

The state Chancellor's DEIA guidance and criteria mandate a wide variety of speech, thought, and behavior. It calls faculty to:

- acknowledge, understand, and apply the state's political ideology, ER-131—132;

- engage in self-assessment of their own personal commitment to the ideology, ER-132;

- commit to "continuous improvement" of their "DEI and anti-racism knowledge, skills, and behaviors," *id.*;

- promote and incorporate DEI and anti-racist pedagogy, *id.*;

- analyze data to find support for the ideology, *id.*;

- articulate the importance of the state's ideology, *id.*;

11

- engage in "service" on behalf of the ideology, including by leading "DEI and anti-racist efforts by participating in DEI groups, committees, or community activities," ER-133;

- "incorporate a race-conscious and intersectional lens" in student programs and activities, *id.*;

- "[participate] in a continuous cycle of self-assessment of one's growth and commitment to DEI and acknowledgement of any internalized [shortcomings]," *id.*;

- develop curriculum and pedagogy that promote DEI ideology, ER-134;

- participate in professional development along ideological lines, *id.*; and

- instruct new employees on the "expectations for their contribution" to the state's DEI and anti-racist ideology, ER-135.

Bakersfield College maintains an Equal Opportunity and Diversity Advisory Committee (EODAC), whose "primary purpose" "is to actively assist/facilitate" the school's "cultural and institutional policies and practices that demonstrate a commitment to greater diversity and inclusion." Bakersfield College, Equal Opportunity & Diversity Advisory Committee, https://perma.cc/BWR6-2U79 (last visited Oct. 18, 2024). Reciting the regulation's mandatory language, EODAC's website declares, "Section 51201 provides us with direction on diversity, equity and inclusion." *Id.*

12

B.    The ideological divide at Bakersfield College

Bakersfield College history professor Daymon Johnson serves as the

Faculty Lead for the Renegade Institute for Liberty (RIFL), of which he

is a founding member. ER-100—101, ¶¶ 1, 2. RIFL is a sanctioned

Bakersfield College organization consisting of faculty members

dedicated to the pursuit of free speech, open inquiry and critical

thinking. RIFL represents a minority position on campus standing in

general opposition to political viewpoints espoused by many faculty

members and members of the school administration, which is aligned

with Section 51201's mandate to "embrace diversity" by, among things,

"intentionally practic[ing] . . . anti-racism." ER-101, ¶ 2.

Former Bakersfield College President Zav Dadabhoy's 2022 holiday

greeting to employees attacked faculty for political noncompliance. ER-

101—102, ¶¶ 6, 7; ER-144. Referencing RIFL, Dadabhoy decried "a

small group promoting exclusion," which he blamed for unspecified

"attacks" on "members of BC's communities of color, and LGBTQ

community," but explained that such exclusion "is not a value of this

institution." *Id*. He then declared that Section 51201 "provides us with

direction on diversity, equity and inclusion," and stressed that "[w]hat

13

really resonates with me is subsection (b)." *Id.* Dadabhoy then added,

"We must not allow the discontent or views of a few to supersede *what we are required* to provide at our college and the work that we have *intentionally developed* to support all members of the community. This is reminder that *we are all tasked with this work.*" *Id.* (emphasis added). Johnson understood the "attacks" to reference RIFL faculty's political speech, and Dadabhoy's exhortation to follow Section 51201 as an instruction to curtail his own non-compliant, dissenting speech and instead speak more consistently with anti-racism ideology. ER-102, ¶ 9.

At a public meeting four days later, then-Board of Trustees Vice President (now President) defendant Corkins termed RIFL faculty's minority political views "abusive." ER-61. RIFL faculty are

> in that five percent that we have to continue to cull. Got them in my livestock operation and that's why we put a rope on some of them and take them to the slaughterhouse. That's a fact of life with human nature and so forth, and I don't know how to say it any clearer.

*Id.*

Continued Corkins, "[W]e've got to get the bad actors out of the room. It just bothers me when the bad actors are paid staff and faculty and if that's where it is we really got a problem." *Id.* Johnson recognized the explicit threat against him if he continued to express political

14

viewpoints that did not comport with the majority DEI ideologies on campus. ER-103, ¶ 12.

Bakersfield College now requires faculty wishing to serve on committees that screen potential new hires to undergo training to assure that their committee service would comply with the school's DEIA policies. ER-103, ¶¶ 13, 14; ER-146.

### C. Bakersfield College investigates and threatens Professor Johnson for disagreeing with a colleague on Facebook

Bakersfield College Professor Andrew Bond posted on his personal Facebook page:

> Maybe Trump's comment about shithole countries was a statement of projection because honestly, the US is a fucking piece of shit nation. Go ahead and quote me, conservatives. This country has yet to live up to the ideals of its founding documents.

ER-57, 103, 149. Johnson reposted Bond's post on RIFL's Facebook page, adding, "Here's what one critical race theorists at BC sounds like. Do you agree with this radical SJW from BC's English Department? Thoughts?" Bond responded by filing an administrative complaint against Johnson for harassment and bullying. *Id.*

But rather than dismiss Bond's complaint out of hand, Dadabhoy subjected Johnson to an investigation that necessitated Johnson's

retention of counsel. ER-104, ¶ 19; ER-148—156. Five months after Bond's complaint, Dadabhoy sent Johnson KCCD's administrative determination that his conduct presented no cause for discipline. ER-57, ER-104, ¶ 20; ER-156. In doing so, however, the district saw fit to pass judgment on each of 29 separate allegations raised in the dispute, including that another professor "liked" a negative comment about Bond (allegation 2, sustained), ER-149, and that "Professor Bond was offended that Professor Johnson described his personal views incorrectly" (allegation 14, sustained), ER-152; *see also* ER-104, ¶ 20.

Although the inquiry "revealed no evidence that Dr. Johnson took any of these actions in his role as a [KCCD] employee," ER-155, officials warned they "will investigate any further complaints of harassment and bullying and, if applicable, will take appropriate remedial action including but not limited to any discipline determined to be appropriate." ER-156; ER-105, ¶ 21.

D.     Bakersfield College punishes professors for speaking

Bakersfield College determined that a public lecture given by then-RIFL Faculty Lead Professor Matthew Garrett entitled "The Tale of Two Protests: Free Speech and the Intellectual Origins of BC Campus

16

Censorship," at which Professor Erin Miller introduced him, constituted "unprofessional conduct." When the school threatened the professors with further discipline, Garrett and Miller sued school officials for violating their First Amendment rights. ER-105, ¶ 22; *Garrett v. Hine*, No. 1:21-cv-00845 (E.D. Cal. 2021).

Subsequently, defendant-appellee Dean of Instruction McCrow charged Garrett with "unprofessional conduct," and advised that Garrett could be charged with "unsatisfactory performance" and violation of BP 3050. ER-158. Garrett's transgressions included:

- Authoring an op-ed piece in the *Bakersfield Californian* that "disregarded the impact of [an] attack" consisting of the posting of political stickers, "took issue with BC's characterization of the stickers as 'hate speech' and 'vandalism,'" "suggested that their content was protected by the First Amendment," and even "went further to suggest that certain terms like 'Cultural Marxism' weren't 'hate speech' but instead speech that challenges a dominant agenda on campus, i.e. the social justice movement," ER-158, ¶ 1;

- Opining that the EODAC "has been consistently staffed by the administration with faculty who hold one particular point of view," ER-159, ¶ 4c, and criticizing the committee chair's conduct at a meeting, ER-159—160, ¶ 5;

- Publicly commenting on the curriculum committee's proposal of two history courses that the courses were the equivalent of a "high school field trip" and "openly partisan training for children," ER-160, ¶ 6;

17

- Causing "very real harm" to students because: a student "felt" that Garrett was a racist who would fail students based on their skin color; a professor whispered something in Garrett's ear; and Garrett allegedly "insult[ed] [another professor] and her way of teaching," ER-161—162, ¶ 11;

- Expressing opinions on a local radio show including that "sociology, ethnic studies, [and] anthropology are producing bad information and poor narratives grounded in history;" that diversity trainings are just ways to figure out how to legally discriminate; and "[c]laim[ing] that Bakersfield College staff are trying to quiet [Garrett]," ER-162, ¶ 12;

- "[R]epeatedly fail[ing], as the Faculty Lead for the Renegade Institute for Liberty, to restrict" criticism of KCCD and faculty "on RIFL's social media" that McCrow alleged to be "baseless," ER-163, ¶ 13; and

- Using his social media account to express critical opinions of the school and faculty, including statements such as, "[a]s a public institution their financials should be open to public criticism," ER-163, ¶ 14.

McCrow added, "Importantly, you caused students to feel unwelcome and unsafe by belittling the community's valid concerns." ER-164.

McCrow commanded Garrett, apparently with respect to his advocacy, "You will not substitute your own judgment for the judgment of your supervisor or other administrators," *id.*, and directed Garrett to address his grievances and complaints internally, ER-165. McCrow also removed Professor Garrett from the EODAC. *Id.* Upon receiving

18

McCrow's letter, Garrett resigned as RIFL Faculty Lead. Johnson succeeded him in that position, and on the EODAC. ER-105, ¶ 25.

Then-college President Dadabhoy subsequently recommended that defendant trustees fire Garrett. KCCD's then-Chancellor, defendant Christian (sued here in her current capacity as state Chancellor) concurred. And defendant trustees did just that. The statement of charges upon which defendants fired Garrett recounted McCrow's allegations, and declared that Garrett failed to follow that notice's directives to cure his allegedly deficient job performance by:

- "[D]eliberately mischaracterizing a Bakersfield College student housing initiative as 'not student dorms' and as 'low income housing,'" and by "print[ing] and distribut[ing] a flyer" criticizing the project "as threatening the neighborhood with loud parties, safety issues, crime, crowded daily parking issues, overflow of parking for events, and decrease in property values," ER-180, ¶ 8 (internal punctuation omitted);

- Providing an interview for *Fox News Digital* in which he criticized Bakersfield College's "affirmative action-type behavior"— "allegations [that] demeaned, demoralized, and disrespected the College's employees and its students;" and "[p]rompting," merely by virtue of being interviewed, third-party comments on social media that were critical of Bakersfield College and its students, ER-181, ¶ 11a;

- Linking to his *Fox News Digital* interview on the RIFL Facebook page, and "continu[ing] to permit the RIFL Facebook page to post" criticism of the school and its faculty, ER-182, ¶ 11b;

19

- Emailing a *Daily Wire* article about the school to another person, ER-182, ¶ 11c, and sharing the article on his social media, ER-183, ¶ 11e;

- Criticizing a faculty member for inciting students against him in an interview with *Inside Higher Ed*, ER-182, ¶ 11d;

- Publishing an open letter responding to "rural cattle guy" Corkins' comparison of dissenting faculty to cattle fit for slaughter, and criticizing Corkins and defendant Gomez-Heitzeberg's performance, ER-183—184, and

- Engaging in "ongoing public attacks [that] demonstrate[d] Garrett's continued refusal to engage in civil, honest discourse or to direct complaints to the appropriate college administrator . . . ." ER-183.

Defendants charged Garrett with other offenses consisting of political speech, including criticizing other professors on Facebook for excessive claims of racism, sexism, and classism, ER-186, ¶ 19; linking to a *Just the News* article critical of the school on RIFL's Facebook page, *id.* ¶ 20; and "accus[ing]" KCCD "of financial mismanagement," *id.* ¶ 21. Among the exhibits to the termination charges, defendants attached four Facebook posts, two other "social media posts," and four published articles. ER-189—190. Although the termination charges did not specifically cite BP 3050, they referenced Garrett's alleged incivility seven times. ER-183; ER-185—186.

Defendants determined that Garrett's speech amounted to immoral or unprofessional conduct per Cal. Educ. Code §§ 87732(a), 87735; dishonesty, *id.* § 87732(b); unsatisfactory performance, *id.* § 87732(c); evident unfitness for service, *id.* § 87732(d); persistent violation of, or refusal to obey, the school laws of the state or reasonable community college regulations, *id.* § 87732(f); and willful refusal to perform regular assignments without reasonable cause, as prescribed by reasonable rules and regulations of the employing district, *id.* § 87735. ER-188.

Garrett challenged his termination. Defendants settled his claims for $2.4 million. Michael Carroll, *Kern Community College District agrees to $2.4 million settlement with professor in retaliation case*, Southern California Record, Aug. 22, 2024, https://perma.cc/NL6Q-TNUU (last visited Oct. 26, 2024).

E. Defendants' adoption and enforcement of an official ideology chills Professor Johnson's speech, and compels him to speak contrary to his conscience

Considering his experience of being investigated by defendants over his Facebook posts, defendants' adoption of an official political ideology that he rejects, defendants' exhortations that their ideology must be affirmed and followed, defendants' application of the termination

21

standards to disfavored political speech, and Professor Johnson's responsibility for some of the speech for which Professor Garrett was fired, Johnson refrains from expressing his political views and from freely participating in the intellectual life of the college for fear that defendants would investigate and discipline him, and terminate his employment based on his viewpoints. ER-106, ¶ 29.

Johnson's reading of the charges against Garrett confirms his understanding that "invalid views," or criticism of views that "the community" deems "valid," are punishable. ER-105, ¶ 24. He's also aware of the mandatory language throughout Title V of the California Code of Regulations with respect to DEIA and anti-racism, ER-106—107, ¶¶ 30-34, backed up by mandatory language from Dadabhoy's email and EODAC's website. ER-107—108, ¶¶ 35-36.

These, combined with Corkins' rhetoric about "bad actors" who should be fired and the school's treatment of Garrett, "all make clear" that Johnson must "curtail [his] own speech and viewpoints" and "express viewpoints that [he] reject[s]." ER-108, ¶ 37. "I am being forced to practice their anti-racist/racist ideology or engage in self-censorship if I want to avoid the same fate as Professor Garrett." *Id.*

Garrett's condemnation of "cultural Marxism" featured in the very first charge of unprofessional conduct that defendants leveled against him. ER-158. Johnson has criticized cultural Marxism, too: he wrote 15 of the 18 RIFL Facebook posts using the term, before discovering that doing so is a fireable offense.[2] Johnson would continue applying the term "to Bakersfield College's social justice agenda," but now he avoids using the term, including on his personal and the RIFL Facebook pages. ER-109, ¶ 40. He refrains from recommending books on the subject, including Ted Cruz's *Unwoke: How to Defeat Cultural Marxism in America*, and Jeffrey Beshears's *American Crisis: Cultural Marxism and the Culture War: A Christian Response*, and withdrew RIFL's sponsorship of a July 7, 2023 event at which the speaker had been invited to address cultural Marxism. ER-109—110, ¶¶ 41-42.

Indeed, "[e]ach of the speakers I have considered inviting on behalf of RIFL would present viewpoints that Defendants have already condemned in the course of disciplining Garrett." ER-110, ¶ 43. Accordingly, Johnson refrains from inviting speakers to campus. *Id.*

---

[2] In Johnson's understanding, cultural Marxism "refers to the present-day social justice agenda and the current leftwing agenda that dominates college campuses today." ER-109, ¶ 39.

Defendants punished Garrett for submitting public comment to the curriculum committee regarding two proposed courses. But so did Johnson. Indeed, Johnson posted the criticism of these courses on RIFL's Facebook page that defendants misattributed to Garrett. Johnson now refrains from speaking about the school's curriculum. ER-111, ¶ 46.

Because defendants punished Garrett for not censoring content on RIFL's Facebook page, Johnson deleted third-party posts from that page, and then stopped administering the page altogether, turning that task over to two retired professors. ER-111, ¶ 48. Indeed, Johnson authored many of the Facebook posts that defendants attributed to Garrett, as well as one Facebook post that defendants punished Garrett for not censoring. ER-112, ¶ 51. They also punished Garrett for posts that Johnson approved as the RIFL Facebook page administrator. ER-112—113, ¶ 51.

Johnson thus self-censors his speech and participation in the RIFL Facebook page, fearing that his posting on and administration of RIFL's Facebook page could lead to punishment. ER-113, ¶ 51. He is further chilled by defendants' administrative determination of Professor Bond's

complaint against him, "with its threat of further investigations and potential discipline." ER-113, ¶ 52. "I thus refrain from expressing any potentially controversial opinions related to Bakersfield College and DEI ideology, both on the RIFL Facebook page and my personal social media accounts." ER-113, ¶ 53.

Johnson shares concerns and criticisms of Bakersfield College similar to those for which defendants terminated Garrett when he expressed them on Terry Maxwell's radio show. ER-113, ¶ 54; ER-178. Accordingly, Johnson has refused requests to appear on that show, and to provide comments to *Fox News* and *The Daily Caller*. ER-113, ¶ 55; *see also* ER-181—182 (terminating Garrett for speaking to *Fox*).

Johnson is also chilled by the fact that defendants terminated Garrett in part because students denounced him as a racist after another professor whispered an allegedly offensive comment in his ear at an EODAC meeting. ER-114, ¶¶ 56-57. Johnson had already altered his voting on the EODAC for fear of retribution. When the EODAC adopted its charge to combat alleged systemic racism by promoting racial diversity, equity, and inclusion, Johnson abstained rather than voting "no" as he wanted. ER-101, ¶ 4. Now, "I have stopped attending

EODAC meetings to completely avoid having to give my conservative views on race, diversity, equity, and inclusion that EODAC addresses. I find myself once again put into a position of self-censorship out of fear of punishment." ER-114, ¶ 58.

Johnson also wants to speak about LGBTQ issues. He wants to "dissent on sexual ideologies," by, for example, protesting the participation of biological men in women's sports and the holding of "drag queen story hours" at the school's daycare facility. But Johnson is chilled by former President Dadabhoy's linkage of DEI mandates with the positions he opposes, a linkage that supported in academic literature and by pro-DEI faculty on campus. ER-114—115, ¶ 59.

Johnson has "previously served on numerous screening committees and participated in the process of hiring faculty, and [wishes] to continue doing so." ER-115, ¶ 61. But he cannot successfully complete the DEIA training now required to serve on screening committees, because he rejects DEIA ideology, will not implement it, and will neither evaluate faculty based on DEIA concepts nor instruct faculty about "expectations for their [DEIA] contributions." ER-115—116, ¶ 61.

Bakersfield College evaluates Johnson's performance every three years. An unsatisfactory evaluation will lead to remediation and potentially termination. Johnson successfully completed an evaluation period prior to the DEIA regime's full implementation; but because he intends to keep working as a professor at Bakersfield College, his performance moving forward will be evaluated under the new DEIA standards and rules. ER-116, ¶ 62. The DEIA requirements chill his speech, including his academic freedom in the classroom and as the Faculty Lead of RIFL, and compel him to affirm, promote, and celebrate a political ideology that he rejects and even finds abhorrent. ER-116— 117, ¶¶ 63-67. Johnson cannot meet the standards set out in the Chancellor's "Competencies and Criteria," which will guide KCCD's evaluation of his teaching, without expressing beliefs and viewpoints that he rejects and without stifling his own viewpoints on political and social topics. ER-118, ¶ 71.

For 28 paragraphs across eight pages, ER-118—125, ¶¶ 72-99, Johnson's declaration explains how "[m]any of the 'themes' set out in the 'Competencies and Criteria' contradict [his] beliefs and values." ER-118, ¶ 72. "I do not want to show fealty to them, express them, or

advance them. In fact, I want to speak out against them because they are all neo-Marxist in nature." *Id.* Almost everything Johnson teaches violates the new DEIA requirements—not just by failing to advance the DEIA and "anti-racist" ideology, but also by criticizing it. ER-125, ¶ 100.

Johnson fears that if he continues teaching his courses as he has designed them, he will surely be deemed "unsatisfactory" in his upcoming evaluations. *Id.* Johnson teaches courses that challenge DEI historical narratives and present views incompatible with DEI. In these courses, Johnson assigns books critical of DEI, written by authors who have been targeted by DEI adherents. ER-125—127, ¶¶ 101-105. Indeed, one DEI sympathizer has already called for Johnson to be fired for recommending and assigning books used in these courses. ER-126, ¶ 104. The material Johnson uses, his pedagogy, and the views he teaches are utterly contrary to the state's DEIA regime and the Chancellor's DEIA competency standards. If Johnson teaches his classes as he normally would and always has, he will not be "demonstrating" or "progressing" toward compliance with the new DEI standards. ER-127, ¶ 105.

28

F.    Procedural history

On June 1, 2023, Johnson sued KCCD's Trustees and Chancellor, and Bakersfield College's President and Dean of Instruction, in the U.S. District Court for the Eastern District of California. Johnson sought to enjoin defendants from applying California's Education Code, BP 3050, and the DEIA regulations, to fire him for his dissenting speech.[3] Johnson soon amended his complaint to name the state's community college system Chancellor, Sonya Christian, and challenge new provisions particularly applying the state's DEIA regime, as well as the regime's implementing "competencies and criteria" that Christian maintains. Per its usual practice, the court did not assign the case a district judge.

On July 13, 2023, Johnson moved for a preliminary injunction. Despite lacking jurisdiction to hear the motion, the magistrate judge sua sponte denied it without prejudice the next day as proofs of service had not been immediately filed. So Johnson refiled his motion July 20,

---

[3] Jerry Fliger has since succeeded Steve Watkin as BC's President, and Steven Bloomberg succeeded Thomas Burke as KCCD's Chancellor. Defendant Corkins became President of KCCD's Board of Trustees. Defendant Nan Gomez-Heitzeberg is now the board's Vice President, and defendant Yovani Jimenez is now the board's clerk.

2023. Defendants sought and obtained a continuance of the hearing date on the magistrate judge's calendar, but as the hearing approached, declined to consent to his jurisdiction. That triggered then-District Judge Ana de Alba's assignment to the case. Judge de Alba referred the preliminary injunction motion to the magistrate judge for a report and recommendation; when defendants moved to dismiss the case, she referred those motions as well to the magistrate judge for his input.

### 1. *Report and recommendation that defendants be enjoined*

On November 14, 2023, the magistrate judge recommended that Johnson's preliminary injunction motion be almost entirely granted, and that the motions to dismiss be denied. ER-54—97. The magistrate judge found that Professor Johnson has standing to bring his claims, as he suffers an injury, ER-70—77, which is traceable to defendants' conduct, ER-77—78, and is redressable by the court, ER-79. The judge rejected KCCD defendants' theory that Johnson's claims failed for not invoking *Monell v. Dep't of Soc. Svcs.*, 436 U.S. 658 (1978), because defendants are state, not municipal officials. ER-79—81.

The magistrate judge "agree[d] with Plaintiff that his proposed posts on social media, media appearances, editorials, and events are speech

30

he would make in his personal capacity," ER-83, and that his "decision on what to teach in the classroom and criticism of 'DEIA ideology' would qualify as teaching and academic writing," ER-84, but found that Johnson's committee service did not involve scholarship and teaching, *id*. The magistrate judge then found that Johnson's protected speech implicated matters of public concern, ER-85, and "that the State's interest in imposing the DEIA regulations and the DEI Competencies and Criteria Recommendations do not outweigh Plaintiff's First Amendment rights," ER-90. The judge also determined that KCCD's civility policy, BP 3050, is impermissibly vague. ER-91.

The magistrate judge concluded that Professor Johnson is suffering irreparable harm, that a preliminary injunction should be issued, and that motions to dismiss should be denied. ER-92—97.

But the next day, Judge de Alba received her commission to join this Court. Johnson's preliminary injunction motion—along with the magistrate judge's determination that Johnson is irreparably harmed and entitled to injunctive relief—then languished unattended for over ten months. First, the case was reassigned to "NODJ." Any active Sacramento division judge could have decided the motion, but none did.

31

On March 14, 2024, the case was reassigned to a newly confirmed district judge. On May 22, 2024, after over two additional months passed with no action on his preliminary injunction motion, Johnson filed an administrative motion to expedite the decision, noting the long delays and his irreparable harm.

This motion, too, like the aging preliminary injunction motion whose decision it sought to expedite, sat unaddressed for months by the district court. The delay constrained Johnson to petition this Court for a writ of mandamus compelling an appealable decision. *In re Johnson*, No. 24-5446 (filed Sept. 5, 2024).

### 2. *The district court's order*

On September 23, 2024, before this Court took any action on Johnson's mandamus petition, the district court granted defendants' motions to dismiss for alleged lack of standing with leave to amend, and denied Johnson's preliminary injunction motion. ER-4—52.

The court acknowledged that defendants fired Garrett in part for "arguably protected speech," ER-20, and that Johnson intended "to engage in similar political speech," ER-21. But it asserted that Johnson did not, for the most part, sufficiently detail his plans. Although

32

Johnson posted about "cultural Marxism" 15 times before the school fired Garrett for using the term, and alleged that he wanted to recommend books on the subject, the district court asserted that Johnson "fail[ed] to offer the other requisite details of the circumstances, including to whom, when, where, or under what circumstances" he would do so. ER-21. The district court did credit Johnson's allegation that he withdrew RIFL sponsorship of a lecture about cultural Marxism, but claimed Johnson did not sufficiently allege that the challenged statutes barred this expression or that he faced risk of enforcement. ER-22.

The district court also asserted that Johnson did not adequately detail his plans to address the curriculum committee and speak with the media. ER-22. It offered the same criticism of Johnson's allegations about his fear of offering his political opinions on campus, filing internal complaints, protesting the participation of biological males in female sports, and the holding of "drag queen story hours." ER-23. The district court was only open to crediting Johnson's allegations about his fear of participating on school committees and inviting speakers. ER-24.

Having only credited a small portion of Johnson's intended speech, the district court then found that this speech is not comparable to that for which defendants terminated Garrett. ER-25. Even though defendants applied the Education Code against Garrett's similar and substantially identical speech, the district court offered *its* view that the Education Code could not "arguably apply to [Johnson's] speech." ER-25; *see also* ER-25—26.

The district court then offered that Johnson did not face a substantial threat of enforcement, because defendants did not specifically threaten him. ER-27—29. The court found that Johnson should not fear the five-month investigation into his speech because it cleared him, ER-29, and that Johnson "makes too much" of the threats to investigate his speech in the future. ER-30. It also offered that Johnson is not similarly situated to Garrett, because while Johnson refrains from speech that figured in Garrett's termination, Johnson's intended speech is not identical to Garrett's. ER-31. The district court also offered that the fact defendants had not yet fired Johnson for his speech renders his fear of termination unreasonable. *See, e.g.,* ER-26, ER-32. The district court rejected Johnson's challenge to KCCD's civility policy along the same

lines it invoked for rejecting his as-applied challenge to the Education Code. ER-33—38.

Turning to the DEIA mandate, the district court reasserted that Johnson did not completely explain what he refrained from speaking. ER-39—40. But although it claimed to not exactly understand what Johnson was compelled to say, the district court found that "Johnson has at least pleaded with enough specificity his intent to *not* speak a political ideology that he opposes and which contravenes his conscience . . . he has alleged adequately that he will *not* speak or do the allegedly required actions." ER-41 (citation and footnote omitted).

Nonetheless, the court offered that Sections 51200 and 51201 were merely precatory, while Johnson's challenge to Section 53425, which requires compliance with local DEIA competencies, is premature. ER-43—44. The district court held that Johnson's conduct would not violate Section 53601, which requires the Chancellor to adopt competencies and criteria that would serve as a reference for local guidelines. ER-44. And because the court viewed the Chancellor's competencies and criteria as merely advisory, it found Johnson's challenge to those "Recommendations" hypothetical. ER-45. For the same reasons, the

court offered Johnson's challenge to Section 53602 premature. ER-46—47.

The district court acknowledged that Section 53605, which requires Johnson to teach, incorporate, and promote DEIA and anti-racist principles, "arguably imposes an obligation upon faculty members, including Johnson." ER-47. But contrary to its earlier finding that Johnson "alleged adequately that he will *not* speak or do the allegedly required actions," ER-41, the court summarily declared that Johnson "has not adequately alleged that his intended conduct is arguably prescribed by [Section 53605]." ER-48. Finally, the district court offered that Johnson faced no threat that Section 53605 or the Chancellor's competencies and criteria would be enforced against him. ER-48—51.

Accordingly, the district court dismissed Johnson's complaint with 45 days' leave to amend and denied his preliminary injunction motion. ER-52. The court subsequently stayed further proceedings pending this appeal's outcome. ER-53.

SUMMARY OF THE ARGUMENT

Professor Johnson plainly has standing to pursue his claims. There is nothing hypothetical about his speech. Because he has already spoken, Johnson is not required to painstakingly detail his intended speech.

But he does so anyway. For paragraph after paragraph, page after page, Johnson's declaration details the speech he has already made and stopped making, the speech he is compelled to make and the reasons why it offends his conscience. Johnson explains the words he can't use, lists the books he can't recommend, the interviews he has refused, the speaking event whose sponsorship he withdrew, the committee vote he changed, the committee he can no longer attend, the Facebook page whose moderation he surrendered to retired faculty beyond defendants' reach, and on and on. Few plaintiffs offer this level of detail.

The magistrate judge correctly declared this evidence "ample." ER-72. But while the district court only grudgingly credited some of Johnson's planned speech (it more readily accepted Johnson's refusal to promote the state's official ideology), that much still suffices to establish this element of standing. And this Court should credit all of Johnson's declaration.

37

Johnson's speech is implicated by the provisions he challenges. Indeed, defendants have already invoked several of them to punish similar speech. Nor is there a serious question that Johnson "faces a 'realistic danger'" of being fired should he continue to speak, or refrain from speaking as commanded. *Ariz. All. for Retired Ams. v. Mayes*, No. 22-16490, 2024 U.S. App. LEXIS 23963, *33 (9th Cir. Sept. 20, 2024).

Defendants have not only threatened to fire faculty for ideological noncompliance, they have done so, firing Johnson's RIFL predecessor for his similar political speech—including for his failure to censor Johnson's Facebook posts. Indeed, they have already investigated another of Johnson's Facebook posts, and threatened to do so again. They effectively bar Johnson from continuing to serve on screening committees, which now require ideological compliance. Unless the court stops them, they will enforce regulations that unmistakably command Johnson to teach official state ideology, and evaluate his performance based on his ideological compliance.

The speech Johnson reasonably fears expressing would either be made off-duty, or in his academic capacity. All of it plainly addresses matters of public concern. No government interest can overcome the

38

First Amendment's protection of Johnson's academic freedom, and its proscription against viewpoint discrimination. Nor does the First Amendment tolerate compelling Johnson to teach and promote an official ideology contrary to his conscience. Johnson is entitled to a preliminary injunction.

## STANDARD OF REVIEW

"We review de novo issues of law underlying the preliminary injunction [order], including questions of jurisdiction over Plaintiff's claims. We review de novo questions of standing." *Isaacson v. Mayes*, 84 F.4th 1089, 1095 (9th Cir. 2023) (internal quotation marks omitted).

Beyond that, "[w]e review the denial of a preliminary injunction for abuse of discretion. A district court abuses its discretion if it rests its decision on an erroneous legal standard or on clearly erroneous factual findings." *Am. Bev. Ass'n v. City & Cty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (internal quotation marks omitted).

## ARGUMENT

I.   PROFESSOR JOHNSON HAS STANDING.

Professor Johnson has standing because (1) he is, in fact, injured; (2) his injuries are caused by the defendants; and (3) the court can redress

his injuries. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014).

This Court applies standing and ripeness requirements "less stringently in the context of First Amendment claims." *Wolfson v. Brammer*, 616 F.3d 1045, 1058 (9th Cir. 2010) (c*iting Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) ("in the First Amendment-protected speech context, the Supreme Court has dispensed with rigid standing requirements")). Thus, to establish an injury-in-fact, Johnson need only allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of prosecution." *Arizona Alliance*, 2024 U.S. App. LEXIS 23963 at *33 (quoting *Driehaus*, 573 U.S. at 159). But Johnson "need not allege a chilling effect to bring [his] vagueness claim" against BP 3050. *Isaacson*, 84 F.4th at 1098.

As this appeal largely concerns the first, injury-in-fact prong, the standards governing each of that prong's three elements merit review.

1. "Because the Constitution requires something more than a hypothetical intent to violate the law, plaintiffs must articulate a

40

'concrete plan' to violate the law in question by giving details about their future speech *such as* when, to whom, where, or under what circumstances." *Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) (internal quotation marks omitted) (emphasis added).

But "'concrete plan' does not mean cast in stone." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc). "A plaintiff need not specify 'when, to whom, where, or under what circumstances' it plans to violate the law. Instead, a plaintiff need only allege that it intends to engage in conduct arguably proscribed by the challenged statute." *Union Gospel Mission of Yakima Wash. v. Ferguson*, No. 23-2606, 2024 U.S. App. LEXIS 20196, at *5 (9th Cir. Aug. 12, 2024) (internal quotation marks and brackets omitted). "The plaintiffs' allegations must be specific enough so that a court need not speculate as to the kinds of [plaintiffs' planned political activity] or as to the contents . . . or circumstances" of plaintiffs' proposed expression. *Lopez*, 630 F.3d at 787 (internal quotation marks omitted).

And when "a plaintiff has previously engaged in conduct that would violate the challenged law, we have relaxed the requisite level of detail." *Seattle Pac. Univ. v. Ferguson*, 104 F.4th 50, 59 (9th Cir. 2024) (citing

41

*Tingley v. Ferguson*, 47 F.4th 1055, 1068 (9th Cir. 2022) ("[W]e do not require plaintiffs to specify 'when, to whom, where, or under what circumstances' they plan to violate the law when they have already violated the law in the past.")). Pleading intent and alleging "corroborating past practice" suffices. *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 488 (9th Cir. 2024).

2. "We have generally held that a plaintiff satisfies [the proscribed-by-a-statute] factor if the 'plaintiff's intended speech *arguably* falls within the statute's reach.'" *Arizona Alliance*, 2024 U.S. App. LEXIS 23963 at *34 (quoting *Getman*, 328 F.3d at 1095). This is a "low hurdle." *Id.* Johnson submits that a history of enforcement dispels any doubt as to whether a statute "arguably" covers speech.

3. With respect to enforcement, the question is whether Johnson "faces a 'realistic danger' of prosecution under the statute[s] [he] challenges." *Arizona Alliance*, 2024 U.S. App. LEXIS 23963 at *33 (citation omitted). But "threatened state action need not necessarily be a prosecution." *Lopez*, 630 F.3d at 786. "Informal measures, such as the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation, can violate the First Amendment" if they

42

"would chill or silence a person of ordinary firmness from future First Amendment activities." *White v. L*ee, 227 F.3d 1214, 1228 (9th Cir. 2020) (internal quotation marks and footnote omitted).

The threat of injury "must be credible, not imaginary or speculative," but "[t]his court has repeatedly held that when a threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing to guard against chilling protected speech." *Arizona Alliance*, 2024 U.S. App. LEXIS 23963 at *33 (citation omitted) (internal quotation marks omitted). "In First Amendment challenges, the plaintiff need only demonstrate that a threat of potential enforcement will cause him to self-censor, and not follow through with his concrete plan to engage in protected conduct." *Id.* at *34-*35 (internal quotation marks omitted); *Tingley*, 47 F.4th at 1068. "[A] plaintiff may reasonably fear prosecution even if enforcement authorities have not communicated an explicit warning to the plaintiff . . . we have never held that a specific threat is necessary to demonstrate standing." *Isaacson*, 84 F.4th at 1100 (internal quotation marks omitted). "[A]n actual arrest, prosecution, or other enforcement action is

not a prerequisite to challenging the law." *Arizona Alliance*, 2024 U.S.
App. LEXIS 23963 at *35-*36 (quoting *Driehaus*, 573 U.S. at 158).

Among other causes, a prosecutorial threat "is credible . . . if there is
a history of past prosecutions or enforcement under the challenged
statute." *Lopez*, 630 F.3d at 786 (internal quotation marks omitted). "A
history of past enforcement against parties similarly situated to the
plaintiffs cuts in favor of a conclusion that a threat is specific and
credible." *Id.* at 786-87. "Enforcement acts against similarly situated
speakers are relevant, both to whether the policies will be applied to
[plaintiffs] and to whether their speech is chilled as an effect." *Moms for
Liberty v. Brevard Pub. Sch.*, No. 23-10656, 2024 U.S. App. LEXIS
25394, at *10 (11th Cir. Oct. 8, 2024) (citing *303 Creative LLC v. Elenis*,
600 U.S. 570, 581-83 (2023)).

  A. Johnson adequately described his intent to speak and teach,
     as well as his intent to refrain from advancing DEIA and
     anti-racist principles.

Johnson may be a professor, but there is nothing academic about his
intent to express himself in ways that would now risk his employment.

RIFL, the organization Johnson leads and whose Facebook page
Johnson wishes to again administer and post political content to,

"emphasi[zes] American ideals and western historical values" and "gives expression to conservative, libertarian, traditional, and Judeo-Christian viewpoints that are often less represented in modern academia." ER-101, ¶ 2. Johnson "generally identif[ies] with the viewpoints espoused by many members of RIFL," and "share[s] many of Professor Garrett's conservative political views and social values." ER-109, ¶ 39. For example, he "share[s] Garrett's concerns about racial issues at Bakersfield College, including how EODAC pushes a hidden affirmative-action agenda, engages in reverse racism, and weaponizes students in order to push their DEI agenda." ER-114, ¶ 58; *see also* ER-113, ¶ 54 ("I share similar concerns and criticisms of Bakersfield College and the policies it implements."). And Johnson holds "conservative view on LGBTQ politics," including opposition to biological men playing women's sports and "drag queen story hours" at Bakersfield College's daycare facility. ER-114—115, ¶ 59.

Johnson is not required to detail every aspect of his planned speech, because he has already expressed himself in ways that now risk his job. *Seattle Pac. Univ.*, 104 F.4th at 59; *Tingley*, 47 F.4th at 1068. "[C]orroborating past practices" plainly support his intent. *Peace Ranch,*

45

93 F.4th at 488. Perhaps the only reason Johnson didn't join Garrett in defendants' dock is that they misattributed some of his RIFL Facebook posts to Garrett. ER-111, ¶¶ 46, 51. Indeed, defendants punished Garrett for not censoring RIFL Facebook posts, including a post Johnson authored, and various posts that Johnson, not Garrett, approved as the page's moderator, ER-112—113, ¶ 51.

Criticizing another professor's political Facebook post earned Johnson a five-month investigation. ER-104, ¶ 19; ER-148—156. Johnson also had RIFL sponsor a speaker critical of cultural Marxism, until he learned that this was dangerous, ER-109—110, ¶ 41, and he wrote the curriculum committee a letter criticizing the same courses that Garrett was punished for criticizing, ER-111, ¶ 46; ER-123—124, ¶ 93. Johnson also participated on the EODAC committee, until it became unsafe to offer his opinions there, ER-114, ¶ 58, and changed his intended vote on the committee's DEIA charge, ER-101, ¶ 4. Johnson has also previously served on screening committees, where he evaluates faculty based on merit rather than "some racial identity group," before defendants required him to use such service to advance DEIA ideology. ER-115—116, ¶ 61.

Beyond the fact that Johnson has already spoken in ways defendants deem "unprofessional," his extensive declaration leaves nothing to the imagination about his "concrete plan" to continue expressing himself. As the magistrate judge observed, Johnson "has presented ample evidence of his intent to engage in speech and conduct that Defendants could conclude is inconsistent with Cal. Educ. Code §§ 87732 and 87735," ER-72, and BP 3050, ER-73.

Johnson now refrains from criticizing the school's curriculum—a touchy subject for defendants, ER-111, ¶ 46—as well as cultural Marxism, ER-109—110, ¶¶ 39-40. Johnson even refrains from recommending books whose titles include the words "cultural Marxism." ER-109—110, ¶¶ 41-42. Indeed, Johnson "refrain[s] from expressing any potentially controversial opinions related to Bakersfield College and DEI ideology, both on the RIFL Facebook page and [his] personal social media accounts." ER-113, ¶ 53. As noted *supra*, Johnson withdrew RIFL's sponsorship of a speaker, and indeed, refrains from sponsoring such controversial speakers altogether. ER-110, ¶ 43. Johnson has also turned down providing commentary to media outlets including Terry Maxwell's radio show, *Fox News*, and *The Daily Caller,*

47

because "going on a conservative television or radio show, and criticizing school policy, funding, and even making comments in a professor's area of expertise, will get me fired." ER-113, ¶ 55. Johnson only stopped participating on the EODAC because he cannot express himself there without fearing for his job. ER-114, ¶ 58. He would return to screening committees but for the DEIA mandate. ER-115, ¶ 61.

The district court credited Johnson's cancellation of the speaker sponsorship. But it should have gone much further. For example, its claim that Johnson did not sufficiently specify where, exactly, he would discuss cultural Marxism, ER-21, is too pedantic—and belied by the record. Johnson wrote about the topic 15 times on RIFL's Facebook page, ER-109, ¶ 39, but now, "I must avoid discussing 'Cultural Marxism' both on Facebook and elsewhere" to avoid discipline for "hateful" speech. ER-109, ¶ 40. After learning that defendants do not tolerate such talk, "I have not posted anything involving the term on either RIFL's Facebook page or my own." *Id.*

Similarly, the district court clearly erred in claiming that Johnson did not offer the "requisite specificity," and "fail[ed] to address the most important part: the 'what,' regarding what he has to say" to Terry

48

Maxwell, *Fox News*, and *The Daily Caller*. ER-22. Johnson declared that he wanted to "[go] on conservative television [and] radio show[s]" to "criticiz[e] school policy, funding, and [offer] comments in [his] area of expertise." ER-113, ¶ 55. Even if Johnson's declaration lacked such detail, it is readily inferable that Johnson feared criticizing Bakersfield College and sharing his views on academia in the media. After all, that was a reason defendants gave for firing Garrett. ER-178. The district court erred by demanding an excessive level of detail about Johnson's speech, by overlooking evidence of that detail, and, in dismissing the complaint, by failing to construe all (if any) inferences in Johnson's favor. *Bolden-Hardge v. Off. of the Cal. State Controller*, 63 F.4th 1215, 1220 (9th Cir. 2023).

Faulting Johnson for not predicting which proposed classes he might criticize in the future, ER-22, notwithstanding the fact that he complained about course proposals directly to the curriculum committee and offered his criticism on Facebook, is inconsistent with the concept of pre-enforcement standing. *Of course* Johnson has no way of knowing which proposals might come before the curriculum committee, let alone how he might view them. For standing purposes, it suffices that he has

taught at the school for over 30 years, and he has participated in shared governance, offering his views on curricular matters, as professors do. *Cf. Tingley*, 47 F.4th at 1068.

This "[C]ourt need not speculate as to the kinds of" political activities Johnson would engage in, "or as to the contents" "or circumstances" of his expression. *Lopez*, 630 F.3d at 787 (internal quotation marks omitted). And without question, Johnson—a committed and strident opponent of DEIA and anti-racism—will not teach or promote the ideology, or adopt its methods and practices. ER-117—118, ¶¶ 69-72. Johnson's many highly specific and detailed objections to DEIA and anti-racism, and to the competencies and criteria, ER-118—125, ¶¶ 73-99, leave no doubt of that.

B.   The challenged provisions more than "arguably" bar, and compel, Johnson's speech.

1. *The Education Code and BP 3050*

Johnson does not believe that his planned speech is "unprofessional" or "immoral." But he challenges the Education Code *as defendants* apply it. So while Johnson would not have fired Professor Garrett—or anyone, for that matter—for talking politics online, criticizing cultural Marxism, etc., defendants did. They specifically applied the challenged

Education Code provisions to Garrett's similar and identical speech, and indeed, to Johnson's speech that they misattributed to Garrett. ER-188. BP 3050 featured in defendants' initial formulation of charges against Garrett. ER-158. And while defendants did not explicitly cite the policy in terminating Garrett, they mentioned Garrett's alleged "incivility" seven times. ER-183; ER-185—186.

Johnson meets the "low hurdle" of showing that the challenged Education Code provisions and BP 3050 "arguably" apply to his speech. *Arizona Alliance*, 2024 U.S. App. LEXIS 23963 at *34.

### 2. *DEIA performance evaluations*

The DEIA performance evaluation provisions more than "arguably" compel Johnson's speech. They plainly command Johnson to prove his teaching performance met ideological expectations if he wants to keep his job. The regulations are replete with mandatory language to this effect:

- "[A]ll district employees *shall* demonstrate the ability to work . . . as *required* by local policies regarding DEIA competencies." Section 53425 (emphasis added).

- "District governing boards *shall* adopt policies for the evaluation of employee performance, including tenure reviews, that *requires* demonstrated, or progress toward, [DEIA] proficiency." Section 53602(a) (emphasis added).

51

- "The evaluation of district employees *must* include consideration of an employee's demonstrated, or progress toward, [DEIA] proficiency." Section 53602(b) (emphasis added).

- "[E]mployees *must* have or establish [DEIA proficiency] to teach, work, or lead within California community colleges." *Id.* (emphasis added).

And Section 53602(c) requires DEIA compliance "as a minimum standard" for evaluating Johnson, requires that his evaluators understand the DEIA benchmarks, and commands his employers to "set clear expectations regarding employee performance related to DEIA principles" and "place significant emphasis on DEIA competencies in employee evaluation and tenure review processes," among other matters. Defendants have already "set" these "clear expectations," in everything from the school president's holiday greetings to the EODAC charge to comply with Section 51201(b).

As the state helpfully explains, "These regulations impact all the employees of the educational ecosystem." ER-141. In this context, "impact" is a synonym for "injure."

The district court's assertion that none of this compels Johnson to do anything, because it doesn't regulate him directly and because KCCD hasn't yet developed its local DEIA standards or adopted policies

requiring the implementation of DEIA standards, suffers from two flaws. First, Johnson *will* be evaluated later, based on his present performance. He must comply today, to avoid termination tomorrow. "One purpose of pre-enforcement standing is to ensure that no law is practically unchallengeable." *Peace Ranch*, 94 F.3d at 489. Barring Johnson from challenging this DEIA mandate because defendants, apparently based on this lawsuit, have not developed their local competencies or policies, would impose a rather unfair Catch-22.

But the district court's reasoning fails for an even more basic, related reason: "A causal chain does not fail simply because it has several 'links,' provided those links are not hypothetical or tenuous." *California v. Azar*, 911 F.3d 558, 571-72 (9th Cir. 2018) (internal quotation marks omitted). True, these regulations are directed in the first instance to defendants. But Johnson stands downhill from them. And "[p]laintiffs need not be the immediate target of a statute to challenge it." *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 850 (7th Cir. 2000) (citations omitted); *see, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 753 (1976). Unless enjoined, the DEIA evaluation regulations will continue to operate on defendants, who will

53

evaluate Johnson in a manner that compels him to speak contrary to his conscience. That KCCD has not yet fully implemented the regulations (owing to this lawsuit) makes Johnson's motion timely, not premature.

Nor is it too early to challenge the state Chancellor's competencies and criteria. They exist, and they serve not only as the reference point for KCCD's local policies, but provide an independent basis for evaluating Johnson's DEIA compliance under Section 53602(a) (requiring defendants to evaluate Johnson per either the locally developed competencies "or those published by the Chancellor").

### 3. The DEIA/anti-racism teaching mandate

There can be no clearer example of a speech-compelling regulation than Section 53605(a), which declares that "[f]aculty members *shall* employ teaching, learning, and professional practices that reflect DEIA and anti-racist principles . . ." (emphasis added). To the extent the inquiry here is one of proving causation, "[w]hen a plaintiff challenges a government regulation that directly applies to or regulates them, this is easy to do." *Arizona Alliance*, 2024 U.S. App. LEXIS 23963 at *14.

54

And Johnson need not wait for any DEIA performance policies to issue under Section 53602 to worry about complying with this mandate. This regulation stands self-contained. Johnson "shall" comply, or he is in violation. "Persistent violation of, or refusal to obey . . . reasonable regulations prescribed for the government of the community colleges by the board of governors" is grounds for termination under Cal. Educ. Code § 87732(f), as Professor Garrett learned.[4]

C.    Johnson faces a realistic danger of termination if he speaks freely and remains true to his conscience.

Johnson does not imagine the danger he faces should he speak and teach as he wishes. Defendants investigated him for five months for his private Facebook posts, and warned that they would continue to investigate complaints about his speech. Johnson's adversaries are eager to complain about his Facebook activity. ER-111—112, ¶¶ 49-50. KCCD defendants seek to "cull" "bad actors" who hold different views, and indeed, they fired RIFL's previous faculty lead for his similar and

---

[4] The same analysis applies to Section 51201, which contains similar mandatory language, e.g., "we must intentionally practice . . . anti-racism."

identical speech, as well as for Johnson's speech. His reticence to keep speaking is reasonable.

Meanwhile, Johnson is already barred from screening committees unless he undergoes DEIA/anti-racism "training." And considering defendants' oft-stated enthusiasm for the ideology, Johnson's expectation that they will enforce the state's DEIA mandate against him, at his next performance evaluation if not sooner, is reasonable as well.

### D. Defendants cause Johnson's injuries, which the court can redress.

That KCCD defendants cause Johnson's injuries is indisputable. They have investigated him, threatened him, and fired his colleague. They are responsible for evaluating Johnson's performance, and they are the ones who make decisions about his employment. Cal. Educ. Code § 70902(b)(4).

But that does not absolve Chancellor Christian from responsibility. Defendants are liable under Section 1983 not only if they "personally participated in a deprivation of the plaintiff's rights" but also if they "caused such a deprivation to occur." *Arnold v. IBM Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981). "[T]he requisite causal connection can be

56

established not only by some kind of direct personal participation in the deprivation but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Merritt v. Mackey*, 827 F.2d 1368, 1371 (9th Cir. 1987) (internal quotation marks omitted). Although she does not immediately control Johnson's employment, Christian issues and updates the "competencies and criteria" that KCCD defendants will use to evaluate Johnson, either directly or via locally developed criteria based on Christian's guidelines. Johnson can seek to stop her conduct, and federal courts have the power to do so. *Wolfson*, 616 F.3d at 1056-57.

\* \* \*

Johnson has standing to bring all his claims.

## II. PROFESSOR JOHNSON IS ENTITLED TO A PRELIMINARY INJUNCTION.

Johnson is entitled to a preliminary injunction because he has made the "threshold showing" that "(1) [he is] likely to succeed on the merits; (2) [he is] likely to suffer irreparable harm without relief; (3) the balance of equities tips in [his] favor; and (4) an injunction is in the public interest." *East Bay Sanctuary Covenant v. Garland*, 994 F.3d

962, 975 (9th Cir. 2021) (citations and internal question marks omitted). "When the government is a party, these last two factors merge." *Id.* (citations omitted).

Under this Court's "sliding scale" approach, "a stronger showing of one element may offset a weaker showing of another." *Ariz. Democratic Party v. Hobbs*, 976 F.3d 1081, 1086 (9th Cir. 2020) (internal quotation marks omitted). Plaintiffs may obtain a preliminary injunction if their appeal at least presents a "substantial case on the merits" or "serious legal questions," *Leiva-Perez v. Holder*, 640 F.3d 962, 965–68 (9th Cir. 2011), provided "that the balance of hardships tips sharply in [their] favor," *id.* at 970.

> A.  The First Amendment bars defendants from compelling Professor Johnson to conform his speech to their ideology.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). "The framers designed the Free Speech Clause of the First Amendment to protect the 'freedom to

58

think as you will and to speak as you think.'" *303 Creative*, 600 U.S. at 584 (quoting *BSA v. Dale*, 530 U.S. 640, 660-61 (2000)).

Defendants' punishment of political dissent as "unprofessional" or "uncivil," and their demands that faculty adhere to and incorporate "DEIA" and "anti-racism" ideology in their expression, thought, and teaching violates two cardinal First Amendment principles: that the "government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction," *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1162 (9th Cir. 2022) (quoting *Rosenberger v. Record & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995)), and that "'[c]ompelling individuals to mouth support for views they find objectionable violates' core First Amendment protections," *Green v. Miss USA, LLC*, 52 F.4th 773, 783 (9th Cir. 2022) (quoting *Janus v. AFSCME, Council 31*, 585 U.S. 878, 892 (2018)). Defendants' civility policy is also impermissibly vague.

     1.  *The First Amendment bars defendants from punishing Professor Johnson for expressing his views.*

No one questions that state college professors may be fired for "unprofessional conduct," "dishonesty," "unsatisfactory performance,"

and the like. But the First Amendment bars defendants from applying these labels to the expression of disfavored viewpoints. Faculty rules and job descriptions at public schools cannot demand ideological conformity.

"[C]itizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S. 228, 231 (2014). "[T]he public has a right to hear the views of public employees," and to "benefit [from] those employees' participation in petitioning activity." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 397 (2011).

While the First Amendment does not protect "statements made by public employees 'pursuant to their official duties,'" *Demers v. Austin*, 746 F.3d 402, 411 (9th Cir. 2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)), *Garcetti*'s rule denying First Amendment protection for on-the-job speech "does not—indeed, consistent with the First Amendment, cannot—apply to teaching and academic writing that are performed 'pursuant to the official duties' of a teacher and professor." *Demers*, 746 F.3d at 412.

The *Pickering* test governs official punishment of speech that a public employee either makes off-duty, or which is "related to

scholarship or teaching." *Id.* at 406. Under this test, "the employee must show that his or her speech addressed 'matters of public concern.'" *Id.* at 412 (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)). If so, courts ask whether "the employee's interest 'in commenting upon matters of public concern'" outweighs the state's interest "as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering*, 391 U.S. at 568). The "burden in justifying a particular [discipline]" under the *Pickering* test is "the State's." *Id.* at 413.

Much of Johnson's speech at issue here—posting on Facebook, inviting and sponsoring speakers, and appearing in media—is speech Johnson would make in his personal capacity. Indeed, defendants admitted that when Johnson posts on RIFL's Facebook page, he does not do so "in his role as a [KCCD] employee." ER-155; *cf. Hernandez v. City of Phoenix*, 43 F.4th 966, 978 (9th Cir. 2022) ("publicly posting on social media suggests an intent to communicate to the public or to advance a political or social point of view beyond the employment context") (internal quotation marks omitted). To the extent that Johnson's foregone speech is that which he would make pursuant to his

official duties as a professor, it either plainly relates to teaching and scholarship, *e.g.*, speech Johnson would make in the course of his hiring and EODAC committee service, or actually *is* teaching and scholarship.

All of this is *Pickering* speech, and all of it relates to matters of public concern. But defendants cannot meet *Pickering*'s second step burden in punishing Johnson's speech under the Education Code or BP 3050, because the First Amendment secures Johnson's academic freedom and prohibits viewpoint discrimination.

To be sure, "[t]he nature and strength of the public interest in academic speech will often be difficult to assess." *Demers*, 746 F.3d at 413. But having established a Department of History, Bakersfield College has no interest in ensuring that Johnson teach history through its official ideological lens or use its politically inspired pedagogy. Additionally, state schools may, if not must, ask their professors to refrain from demanding ideological, political, or religious conformity from their students, whose First Amendment rights the state must respect. Professors in mainland China might be required to conform their classroom speech to "Mao Zedong Thought," *see* Education Law of the People's Republic of China, ch. 1, art. 3 (Sept. 1, 1995),

https://perma.cc/8GHT-B45L (last visited Oct. 29, 2024), but the First

Amendment bars defendants' imposition of "DEIA thought."

"If there is a bedrock principle underlying the First Amendment, it is

that the government may not prohibit the expression of an idea simply

because society finds the idea offensive or disagreeable." *Texas v.*

*Johnson*, 491 U.S. 397, 414 (1989). "The Free Speech Clause generally

prohibits suppressing speech 'because of its message.'" *Waln*, 54 F.4th

at 1161 (quoting *Rosenberger*, 515 U.S. at 828-29); *see Minnesota Voters*

*All. v. Mansky*, 585 U.S. 1, 11 (2018) ("restrictions based on content

must satisfy strict scrutiny, and those based on viewpoints are

prohibited").

"[T]he dangers of viewpoint discrimination are *heightened* in the

university setting," *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127

n.6 (11th Cir. 2022) (internal quotation marks omitted), as "teaching

and [academic] writing are 'a special concern of the First Amendment.'"

*Demers*, 746 F.3d at 411 (quoting *Keyishian v. Bd. of Regents*, 385 U.S.

589, 603 (1967)). "The Supreme Court has repeatedly stressed the

importance of protecting academic freedom under the First

Amendment," which "does not tolerate laws that cast a pall of orthodoxy

over the classroom." *Id.* (quoting *Keyishian*, 385 U.S. at 603). "[A]cademic freedom and political expression [are] areas in which government should be extremely reticent to tread." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

The First Amendment thus does not tolerate defendants' punishment of Johnson's disfavored expression. Though the faculty lounge may dislike Johnson's speech, "[t]he desire to maintain a sedate academic environment . . . [does not] justify limitations on a teacher's freedom to express himself on political issues in vigorous, argumentative, unmeasured, and even distinctly unpleasant terms." *Rodriguez v. Maricopa Cnty. Cmty. College Dist.*, 605 F.3d 703, 708-09 (9th Cir. 2009) (internal quotation marks omitted).

### 2. *Defendants' "civility" policy is vague.*

Defendants' policies are unconstitutionally vague if they "fail to afford employees a reasonable opportunity to understand what conduct [they] prohibit, or that the provisions permit arbitrary and discriminatory enforcement." *Hernandez*, 43 F.4th at 982 (internal quotation marks omitted). BP 3050 fails on both grounds. It is unclear what this policy proscribes in the vast majority of its intended

applications, or even what these intended applications might be. It is, however, clear that defendants invoke this policy to terminate faculty whose political views offend the dominant faction.

What constitutes "civility" varies from speaker to speaker, and from listener to listener. Some speech, however well-intentioned, falls flat. Some people are unusually sensitive. And others are deliberately sensitive, to justify silencing their critics. Terms like "threat" and "harassment" might have common, more objective understandings, but who determines whether a person speaks in a "respectful manner," or even the level of respect that might be due in a given circumstance? Physical aggression is an obvious concept, but what is "verbal aggression?" "Ridicule" is a protected viewpoint—whatever might be deemed "ridicule" in a given situation.

What is clear, however, is that some KCCD professors and officials view other people's political expressions as moral failings and personal affronts, and one professor has already been disciplined for political speech deemed to violate BP 3050. Professor Johnson can only watch his words and hope that nothing he says is deemed to lack "civility." This policy is hopelessly vague.

65

3. *The First Amendment bars defendants from
compelling Professor Johnson to think and speak
in accordance with their ideology.*

While "the *Pickering* framework was developed for use . . . in cases

that involve 'one employee's speech and its impact on that employee's

public responsibilities,'" it does not map well to cases "involv[ing] a

blanket requirement." *Janus*, 585 U.S. at 907 (quoting *United States v.

Nat'l Treasury Emps. Union (NTEU)*, 513 U.S. 454, 467 (1995)). "[I]n

considering general rules that affect broad categories of employees, we

have acknowledged that the standard *Pickering* analysis requires

modification." *Id.* (citation omitted). "A speech-restrictive law with

widespread impact, we have said, gives rise to far more serious concerns

than could any single supervisory decision." *Id.* (citation omitted).

Accordingly, "the Government's burden is greater with respect to [a]

statutory restriction on expression than with respect to an isolated

disciplinary action." *NTEU*, 513 U.S. at 468. "[T]he end product of those

adjustments . . . resemble exacting scrutiny." *Janus*, 585 U.S. at 907.

"[W]here the State's interest is to disseminate an ideology, no matter

how acceptable to some, such interest cannot outweigh an individual's

First Amendment right to avoid becoming the courier for such

message." *Wooley v. Maynard*, 430 U.S. 705, 717 (1977) (footnote omitted). It does not "matter whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include. All that offends the First Amendment just the same." *303 Creative*, 600 U.S. at 587 (citations omitted).

And just as defendants may not compel people to mouth support for DEIA and "anti-racism," or demand that others commit themselves to such ideology, they cannot compel faculty to do so as a condition of employment. "[T]he unconstitutional conditions doctrine . . . vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013). "In the First Amendment context, this doctrine provides that the Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *Boardman v. Inslee*, 978 F.3d 1092, 1109 (9th Cir. 2020) (internal quotation marks omitted).

67

California's DEIA directives are plainly unconstitutional. If a state "required all residents to sign a document expressing support for a particular set of positions on controversial public issues—say, the platform of one of the major political parties[,] [n]o one, we trust, would seriously argue that the First Amendment permits this." *Janus*, 585 U.S. at 892.

The Supreme Court might be too trusting, as defendants not only compel Professor Johnson to conform his curriculum and pedagogy to their politics in direct contravention of his First Amendment rights, but seek to transform him to *be* their type of ideologue—to practice "self-reflection" by "[e]ngag[ing] in self-assessment of [his] own commitment to DEI and internal biases, and seek[] opportunities for growth to acknowledge and address the harm caused by internal biases and behavior," ER-132; seek "self-improvement" by "demonstrat[ing] a commitment to continuous improvement as it relates to [his] DEI and anti-racism knowledge, skills, and behaviors," *id*.; "[p]articipate[] in a continuous cycle of self-assessment of [his] growth and commitment to DEI and acknowledgement of any internalized personal biases and racial superiority or inferiority," ER-133; and "introduce" newcomers to

68

"expectations for their contribution" to the school's DEI and anti-racism "focus," ER-135.

"[S]uch compulsion so plainly violates the Constitution." *Janus*, 585 U.S. at 892. Defendants take DEIA and anti-racism ideology very seriously, and in their personal capacities the First Amendment guarantees their right to do so. But in their official capacities, the First Amendment forbids them from imposing their ideology on everyone else. It would forbid this imposition even if defendants' ideology were not, as it is, extremely controversial. California's imposition of a DEIA ideological mandate, root and branch, is unconstitutional. It must be enjoined.

## B.    Johnson suffers irreparable harm.

"Irreparable harm is relatively easy to establish in a First Amendment case," as a party need only "demonstrate[] the existence of a colorable First Amendment claim." *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 851 (9th Cir. 2019) (internal quotation marks omitted). That is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

69

C.    The balance of equities, and the public interest, favor Johnson.

"Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (internal quotation marks omitted). "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (internal quotation marks omitted); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (noting that the government "cannot suffer harm from an injunction that merely ends an unlawful" or unconstitutional practice). Accordingly, "[t]he public interest and the balance of the equities favor preventing the violation of [Plaintiffs'] constitutional rights." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017) (quotation marks omitted).

## CONCLUSION

The district court's order should be vacated, and the case should be remanded with instructions to grant Johnson's preliminary injunction motion.

Dated: October 30, 2024               Respectfully submitted,

                                      /s/ Alan Gura
                                      Alan Gura
                                      INSTITUTE FOR FREE SPEECH
                                      1150 Conn. Ave. N.W., Ste. 801
                                      Washington, D.C. 20036
                                      202.301.3300
                                      agura@ifs.org

                                      *Counsel for Appellant*

STATEMENT OF RELATED CASES

Plaintiff is unaware of any related cases pending before this Court.

71

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____24-6008_____

I am the attorney or self-represented party.

**This brief contains \_\_\_\_\_13,000_____ words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X ] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** _____s/Alan Gura_____ **Date** \_\_\_\_October 30, 2024\_\_\_\_
*(use "*s/[typed name]*" to sign electronically-filed documents)*

72