No. 24-6008

# United States Court of Appeals
for the
# Ninth Circuit

———————————

DAYMON JOHNSON,

*Plaintiff-Appellant,*

v.

STEVE WATKIN, *et al.,*

*Defendants-Appellees.*

———————————

On appeal from the U.S. District Court for the Eastern District of California
Case No. 1:23-cv-00848-KES-CDB
Honorable Kirk E. Sherriff, Presiding

## BRIEF OF *AMICI CURIAE* PROFESSORS LOREN PALSGAARD, DAVID RICHARDSON, BILL BLANKEN, AND LINDA DE MORALES IN SUPPORT OF PLAINTIFF-APPELLANT AND VACATUR

ZACHARY SILVER
CONOR T. FITZPATRICK
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE, Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
zach.silver@thefire.org
conor.fitzpatrick@thefire.org

DANIEL ORTNER
*Counsel of Record*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
Telephone: (215) 717-3473
daniel.ortner@thefire.org

*Attorneys for* Amici Curiae

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ IV

INTEREST OF *AMICI CURIAE* ............................................... 1

SUMMARY OF ARGUMENT ................................................... 2

ARGUMENT ............................................................................ 6

    I.    The California Community Colleges System's DEIA Regulations Violate the First Amendment by Compelling Professors to Endorse the State's Viewpoints. .................................................................. 6

        A.    The DEIA Regulations Bind All Community College Districts and Require Faculty to Embrace Controversial Views. ...................... 6

        B.    *Amici*'s Experiences Demonstrate the DEIA Regulations Suppress Protected Speech. ................... 12

    II.    The DEIA Regulations Violate the First Amendment. ......................................................... 17

        A.    The DEIA Regulations Infringe on Professors' Vital Interests in Freedom of Speech and Academic Freedom. .................................. 17

        B.    The DEIA Regulations Are Unconstitutional Under Strict Scrutiny. .................................. 22

        C.    The DEIA Regulations Are Unconstitutional Under the *NTEU* Test. .................................. 24

        D.    The DEIA Regulations Are Unconstitutionally Vague. ............................................. 27

    III.    California's Actions Are Part of an Alarming Trend Towards Suppressing Disfavored Faculty

Speech, and the Court Must Step in to Protect
Academic Freedom.................................................. 29

CONCLUSION ......................................................... 31

# TABLE OF AUTHORITIES

**Cases**　　　　　　　　　　　　　　　　　　　　　　　　　　**Page(s)**

*Adamian v. Jacobsen,*
　523 F.2d 929 (9th Cir. 1975) .................................................. 28

*Barone v. City of Springfield,*
　902 F.3d 1091 (9th Cir. 2018) .............................................. 25

*Cole v. Richardson,*
　405 U.S. 676 (1972) ............................................................ 21

*Demers v. Austin,*
　746 F.3d 402 (9th Cir. 2014) ......................................... 18, 31

*Elfbrandt v. Russell,*
　384 U.S. 11 (1966) .............................................................. 28

*Grutter v. Bollinger,*
　539 U.S. 306 (2003) ............................................................ 31

*Hardy v. Jefferson Cmty. Coll.,*
　260 F.3d 671 (6th Cir. 2001) ......................................... 19, 31

*Hill v. Colorado,*
　530 U.S. 703 (2000) ............................................................ 27

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps, Council 31,*
　585 U.S. 878 (2018) ....................................................... 24, 25

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
　385 U.S. 589 (1967) ............................... 3, 5, 18, 19, 20, 21, 31

*Long Beach Area Peace Network v. City of Long Beach,*
　574 F.3d 1011 (9th Cir. 2009) .............................................. 23

*Matal v. Tam,*
　582 U.S. 218 (2017) ............................................................ 22

*McCauley v. Univ of V.I.,*
　618 F.3d 232 (3d Cir. 2010)................................................. 23

*Meriwether v. Hartop,*
　992 F.3d 492 (6th Cir. 2021) ..................................... 18, 19, 20

*Moonin v. Tice,*
　868 F.3d 853 (9th Cir. 2017) .............................................. 25

*Nat'l Inst. of Family & Life Advocs. v. Becerra* (*NIFLA*),
   585 U.S. 755 (2018) .................................................................... 22, 23, 24

*Novoa v. Diaz,*
   No. 22–13994 (11th Cir.) ........................................................................ 5

*Palsgaard v. Christian,*
   No. 1:23-cv-01228 (E.D. Cal.) ................................................................ 2

*Papish v. Bd. of Curators of Univ. of Mo.,*
   410 U.S. 667 (1973) ............................................................................... 23

*Pernell v. Fla. Bd. of Govs. of State Univ. Sys.,*
   641 F. Supp. 3d 1218 (N.D. Fla. 2022) ...................................... 5, 19, 30

*Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205,*
   391 U.S. 563 (1968) ............................................................................... 25

*Progressive Democrats for Soc. Just. v. Bonta,*
   73 F.4th 1118 (9th Cir. 2023) ............................................................... 25

*Regents of the Univ. of Cal. v. Bakke,*
   438 U.S. 265 (1978) ............................................................................... 23

*Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,*
   605 F.3d 703 (9th Cir. 2010) .................................................... 19, 22, 31

*Rosenberger v. Univ. of Va.,*
   515 U.S. 819 (1995) ........................................................................ 18, 22

*Rutan v. Republican Party of Ill.,*
   497 U.S. 62 (1990) ................................................................................. 21

*Shelton v. Tucker,*
   364 U.S. 479 (1960) ................................................................... 2, 18, 21

*Smith v. Goguen,*
   415 U.S. 566 (1974) ............................................................................... 27

*Sweezy v. New Hampshire,*
   354 U.S. 234 (1957) ............................................................................... 31

*United States v. Nat'l Treasury Emps. Union* (*NTEU*),
   513 U.S. 454 (1995) ................................................................... 24, 25, 26

**Statutes**

Cal. Educ. Code § 87668 ......................................................................... 14

Cal. Educ. Code § 87732.........................................................6, 14

Cal. Educ. Code § 87735.........................................................6, 14

Fla. Stat. § 1000.05.................................................................5, 30

**Other Authorities**

Faculty Contract art. 13, § 2.........................................................13

Faculty Contract art. 14, § E.........................................................13

State Ctr. Cmty. Coll. Dist. Admin. Regs. 7123.................................14

State Ctr. Cmty. Coll. Dist. Admin. Regs. 7360.................................14

**Regulations**

Cal. Code Regs. tit. 5, § 53425.........................................................7

Cal. Code Regs. tit. 5, § 53601.....................................................6, 7

Cal. Code Regs. tit. 5, § 53602..............................................6, 7, 13

Cal. Code Regs. tit. 5, § 53605.......................................................23

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are four full-time, tenured faculty members at colleges in California's State Center Community College District. Each is opposed to the ideas and viewpoints the California Community Colleges System's recent DEIA Regulations[2] (as enforced through Implementation Guidelines issued by the Chancellor of the California Community Colleges)[3] require them to endorse, such as "anti-racism" and "intersectionality." Under the DEIA Regulations, if *amici* and similarly situated faculty do not alter their teaching to endorse California's

---

[1] No counsel for a party authored this brief in whole or in part. Further, no person, other than *amici*, its members, or its counsel contributed money intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

[2] DEIA Evaluation and Tenure Review of District Employees, 2023-0317-02P (endorsed Mar. 17, 2023) (codified at Cal. Code Regs. tit. 5, §§ 52510, 53425, 53601, 53602, 53605, 53400, 53401, 53403).

[3] As used herein, "Implementation Guidelines" refers collectively to three guidance documents adopted issued by the Chancellor's Office as directives to the community college districts on how they are expected to implement the DEIA Regulations: (1) the *Diversity, Equity and Inclusion Competencies and Criteria Recommendations*; (2) the *Model Principles and Practices for DEI in Curriculum*; and (3) the *Diversity, Equity, Inclusion, and Accessibility Glossary of Terms*. These documents are discussed in greater detail *infra* Section I.A.

preferred views, they face negative performance reviews, discipline, or termination.

*Amici* have a significant interest in this case because they are plaintiffs in a separate federal lawsuit challenging the constitutionality of the DEIA Regulations and the Implementation Guidelines. *Palsgaard v. Christian*, No. 1:23-cv-01228 (E.D. Cal.). *Amici*'s lawsuit also challenges the constitutionality of the provisions of State Center's faculty contract that implement the DEIA Regulations (including the Implementation Guidelines). *Id.*

*Amici* file this brief in support of Professor Johnson to illuminate the ongoing chilling effect the DEIA Regulations are having on California's community college faculty, and to urge this Court to protect academic freedom across the state by vacating the district court's decision and remanding with instructions to preliminarily enjoin the Regulations.

## SUMMARY OF ARGUMENT

"The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). That is because "the classroom is peculiarly the 'marketplace of ideas,'" and our "Nation's future depends upon leaders

2

trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (cleaned up).

But California Community Colleges' DEIA Regulations trample on that core right to freedom of thought and inquiry, forcing faculty to parrot the government's view on contentious issues surrounding diversity, equity, inclusion, and accessibility (DEIA). In California, it is now a "minimum qualification" for employment as a community college professor to embrace hotly contested concepts such as "anti-racism" and "intersectionality." Community college faculty must "acknowledge," "promote," "incorporate," "advocate for," and "advance" the state's DEIA principles and "weav[e] them . . . into every course." The government even warns faculty against "weaponizing academic freedom" to "inflict curricular trauma" on students by teaching concepts or assigning readings *contrary* to the State's mandated DEIA viewpoints.

California's DEIA Regulations unconstitutionally "cast a pall of orthodoxy over the classroom" at community colleges across California. *Keyishian*, 385 U.S. at 603. The Regulations require professors espouse

3

the State's preferred viewpoints and penalize the airing of alternate views. But the government can no more mandate professors embrace "anti-racism" and "intersectionality" than it could "capitalism" or "socialism."

Contrary to the lower court's erroneous conclusion, there is nothing speculative or uncertain about this outcome. The chill and self-censorship is happening today, in college classrooms across California.

*Amici* are four California community college professors whose experiences demonstrate the dramatic impact of the DEIA Regulations on academic freedom. Just like Professor Johnson, they must drastically change what they teach and self-censor. For instance, *amicus* Palsgaard fears that if he continues to air debates on controversial topics like the death penalty, affirmative action, and drug legalization, he will be accused of being insufficiently anti-racist or even of "inflicting curricular trauma." Meanwhile, *amici* Blanken and de Morales must either introduce pedagogically inapplicable DEIA concepts into their chemistry classrooms or face possible termination.

California is unfortunately not alone in its efforts to suppress disfavored views on DEIA in colleges and universities. States like Florida

have attempted to prohibit teaching the very same DEIA views that California now makes mandatory. Fla. Stat. § 1000.05(4)(a)(8). But the core of academic freedom is that the government cannot mandate "pro" or "con" on any issue. That is why a district court entered a preliminary injunction against Florida's interference. *Pernell v. Fla. Bd. of Govs. of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1272–73 (N.D. Fla. 2022).[4] California's DEIA Regulations are the opposite side of the same coin and should have fared no better.

The First Amendment guarantees our colleges and universities will remain "the marketplace of ideas," where every idea faces rigorous scrutiny. *Keyishian*, 385 U.S. at 603. But California is trying to shut the marketplace down because it does not like what some professors are selling. That is constitutionally intolerable. This Court should reverse the district court's erroneous dismissal of Mr. Johnson's claims and direct entry of a preliminary injunction.

---

[4] The Foundation of Individual Rights and Expression, counsel for *amici*, represents a professor, a student, and a student group in a related challenge to the Stop WOKE Act that is currently consolidated with *Pernell* on appeal before the Court of Appeals for the Eleventh Circuit. *Novoa v. Diaz*, No. 22–13994 (11th Cir.).

## ARGUMENT

I. **The California Community Colleges System's DEIA Regulations Violate the First Amendment by Compelling Professors to Endorse the State's Viewpoints.**

   A. **The DEIA Regulations Bind All Community College Districts and Require Faculty to Embrace Controversial Views.**

California's DEIA Regulations and related mandates violate the First Amendment because they compel California Community Colleges' faculty to parrot the government's views or face discipline up to and including termination. *See* Cal. Educ. Code §§ 87732, 87735. But the district court held the DEIA Regulations do not regulate Professor Johnson directly, so he lacked standing to challenge them. ER-052. That was incorrect.

The DEIA Regulations order <u>all</u> California's community college districts to enforce faculty members' conformance to the State's DEIA viewpoints. Community college districts must "adopt policies for the evaluation of employee performance, including tenure reviews" that "place significant emphasis on" employees' "demonstrated, or progress toward, proficiency" in DEIA. Cal. Code Regs. tit. 5, §§ 53601(b), 53602(a), (c)(4). According to the California Community Colleges' Chancellor's Office, conforming to DEIA Regulations is now "a minimum

6

standard and a system-wide requirement" for employment. Memorandum: Guidance on Implementation of DEIA Evaluation and Tenure Review Regulations (May 5, 2023) [hereinafter Chancellor's Memo], ER-139; *accord* Cal. Code Regs. tit. 5, §§ 53425, 53601(a)–(b), 53602(a)–(c).

Under the DEIA Regulations, the Chancellor must "adopt and publish guidance describing DEIA competencies and criteria" in order to direct the community college districts, Cal. Code Regs. tit. 5, § 53601(a). Community college district policies must comply with these competencies and criteria either by (1) incorporating the competencies and criteria directly into their employee evaluation processes, or (2) "us[ing]" the competencies and criteria "as a reference" for creating their own "locally-developed DEIA competencies" for job evaluations. *Id.* §§ 53601(b), 53602(a).

Fulfilling his duty, the Chancellor adopted and published three documents that collectively establish the mandatory "competencies and criteria": (1) the *Diversity, Equity and Inclusion Competencies and Criteria Recommendations* ("*Competencies and Criteria*"); (2) the *Model Principles and Practices for DEI in Curriculum* ("*Model Principles*"); and

7

(3) the *Diversity, Equity, Inclusion, and Accessibility Glossary of Terms* ("*DEIA Glossary*"). To avoid confusion, these three documents are collectively referred to as the Implementation Guidelines.

### Competencies and Criteria

The *Competencies and Criteria* specify "the skills, knowledge, and behaviors that California Community College employees must demonstrate or acquire to work, teach, and lead." ER-138. Under the *Competencies and Criteria*, faculty must "[a]cknowledge[]" the "diverse, fluid, and intersectional" nature of "cultural and social identities," "[d]emonstrate" their "ongoing awareness and recognition" of "structures of oppression and marginalization," "[s]eek[] DEI and anti-racist perspectives," and continually improve their "own commitment to DEI and internal biases." ER-131–32.

The Chancellor's Office included the *Competencies and Criteria* in the Chancellor's Memo, noting that they "provide a starting point for community college districts to integrate evaluation and tenure processes at the local level." ER-138, 142. And at the preliminary injunction hearing before Magistrate Judge Baker, the State conceded that any "locally developed" standards a district adopts must "be consistent with"

8

the *Competencies and Criteria*. Prelim. Inj. Hr'g Tr. 12:3–18, Sept. 7, 2023, ECF No. 57.

Through the *Competencies and Criteria*, California mandates faculty "[p]romote[] and incorporate[] DEI and anti-racist pedagogy" into their courses. ER-132. Their teaching must use "a race-conscious and intersectional lens" and be "culturally affirming" to students. ER 132–34.

Even outside the classroom, California now forces community college faculty to "[a]dvocate[] for and advance[] DEI and anti-racist goals and initiatives" by "participating in DEI groups, committees, or community activities that promote systemic and cultural change to close equity gaps and support minoritized groups." ER 133.

### Model Principles

To ensure professors are bull-horning the State's preferred DEIA views to students, the *Model Principles*[5] provides community college districts a "framework" for "support[ing] the implementation of culturally relevant and responsive curriculum at local levels." *Model Principles* 2. The *Model Principles* directs professors to supplement their course

---

[5] The *Model Principles* is available at https://perma.cc/YM6Z-YCGZ.

9

materials with DEIA materials to ensure that "equity frameworks and principles in decision-making are prioritized and addressed." *Id.* at 3. The *Model Principles* also demands professors "[r]eword language from a colonized mindset to an equity mindset," "[s]hift" from an "individualist perspective" "to a collectivism perspective," and "[u]se culturally responsive practices and a social justice lens" regardless of the discipline or subject. *Id.* at 3, 6. Moreover, the *Model Principles* constrains faculty from voicing opinions or assigning materials that contradict the mandated perspective, warning them not to "'weaponize' academic freedom and academic integrity as tools to impede equity" or "inflict curricular trauma on our students." *Id.* at 4.

*DEIA Glossary*

The *DEIA Glossary*,[6] included in the Chancellor's Memo, tells faculty the views the government expects them to echo. *DEIA Glossary* 1. For example, the *DEIA Glossary* informs professors that being "equity-minded" requires being "race-conscious," *id.* at 5, a hotly debated concept many reject as racist.[7] The *Glossary* also makes clear the idea of "color

---

[6] The *DEIA Glossary* is available at: https://perma.cc/L9UD-Z7M2.

[7] *See, e.g.*, Robert D. Alt, *Toward Equal Protection: A Review of Affirmative Action*, 36 Washburn L.J. 179, 179 (1996–97) ("To pursue the

blindness" is unacceptable for faculty to espouse, calling it a "racial ideology" which "perpetuates existing racial inequalities and denies systematic racism." *Id.* at 2. The *DEIA Glossary* similarly condemns even the term "merit" as unacceptably "protect[ing] White Privilege under the guise of standards." *Id.* at 7.

Both individually and collectively, the Implementation Guidelines plainly dictate that professors must advance the state's preferred DEIA views in their classroom. Therefore, contrary to the district court's holding, Professor Johnson's injury is certain, not hypothetical. ER-018. Regardless of whether Kern Community College District adopts the Implementation Guidelines directly or creates its own locally-developed DEIA standards "consistent with" the Implementation Guidelines, it must comply with the Board of Governors' command to give Professor Johnson a lower overall performance rating if he refuses to embrace the State's DEIA dogma as his own. There is therefore no question that he is expected to embrace the viewpoints of the DEIA regulations and "must comply today, to avoid termination tomorrow." Appellant's Br. 53.

---

concept of racial entitlement—for even the most admirable and benign of purposes—is to reinforce and preserve for future mischief the way of thinking that produced race slavery, race privilege, and race hatred.").

**B.** *Amici*'s Experiences Demonstrate the DEIA Regulations Suppress Protected Speech.

The DEIA Regulations are censoring and chilling protected academic expression right now. The Court need look no further than *amici*'s experiences with State Center Community College District's implementation of the DEIA Regulations to see the pall of orthodoxy and chill cast over California's community college faculty. But State Center's implementation of the DEIA Regulations, and *amici* professors' experiences and self-censorship, is not an outlier. It is exactly what the DEIA Regulations contemplate and require.

State Center chose to incorporate the Implementation Guidelines directly into its collective bargaining agreement with full-time faculty (the "Faculty Contract"). *See, e.g.*, Decl. of Juliana Mosier ¶ 3, *Palsgaard*, No. 1:23-cv-01228, ECF No. 24-1.[8] That means under the Faculty Contract, State Center now evaluates faculty based not only on their fulfillment of core teaching requirements like "[k]nowledge of subject matter," but also on their "demonstration of, or progress toward . . . DEIA-related competencies[] and teaching and learning

---

[8] The Faculty Contract is available at: https://perma.cc/WGW8-W8XD.

practices that reflect DEIA and anti-racist principles," their "reflect[ion] [of] knowledge of the intersectionality of social identities," and their "recogni[tion] [of] the . . . psychological, physical, cognitive, and social differences that occur among individuals." Faculty Contract art. 13, § 3(A).

The evaluation process also requires faculty to submit written self-assessments "demonstrat[ing] an understanding of [DEIA] competencies and anti-racist principles, and how they have put those principles into practice to improve equitable student outcomes and course completion." *Id.* § 2(E)(4). So professors must not only preach the State's preferred DEIA views, they must self-assess how good of a job they did proselytizing them.

Evaluators must give these DEIA-related requirements "significant" weight during faculty evaluations. Cal. Code Regs. tit. 5, § 53602(a), (c)(1), (4). Faculty who insufficiently incorporate the government's preferred views into their lessons face negative professional repercussions, including being placed on a "plan for improvement," denied a salary increase, disciplined, or terminated. Faculty Contract art. 13, § 2(C)(6)(a)(vii), (b)(iv), art. 14, § E; State Ctr.

13

Cmty. Coll. Dist. Admin. Regs. 7123, 7360; *see also* Cal. Educ. Code §§ 87732(c), (f), 87735, 87668. In short, parroting California's views on DEIA and contested academic concepts like "anti-racism" is now a must for State Center faculty, not a may.

*Amici*, like Professor Johnson, oppose the ideas and viewpoints the DEIA Regulations require them to embrace, like "anti-racism" and "intersectionality." They object to endorsing the mandatory DEIA views and would not, but for these requirements, espouse them in the classroom. *Amici* are now placed in the catch-22 of either teaching their courses in conformance with their pedagogical judgment, or in conformance with the state's mandated views.

For instance, *amicus* Professor Palsgaard used to assign challenging reading like Martin Luther King, Jr.'s *Letter from Birmingham Jail*, Victor Davis Hanson's *Mexifornia*, books by William Faulkner, and works by Flannery O'Connor to his English students. But he is no longer assigning those works because they contain racial slurs, advocate forbidden concepts like a "color blind" society, and are contrary to the State's preferred "anti-racist" viewpoint. *See Competencies and Criteria* 4–5, ER-132–33; *Glossary* 2.

14

As a result of the threat of the DEIA Regulations, Professor Palsgaard is also second guessing his long-running practice of having students watch debates on controversial topics like the death penalty, affirmative action, and drug legalization. By challenging students to consider arguments supporting the death penalty, opposing affirmative action, and opposing drug legalization, Palsgaard risks being accused of failing to "promote[] a race-conscious and intersectional lens" and not being adequately "culturally affirming," as the DEIA Regulations require but fail to define. *Competencies and Criteria* 4–5, ER-132–33; *see also Glossary* 10 (defining "reverse racism" as "a form of racism that denies the existence of White privilege . . . ."); *infra* Section II.D.

Similarly, *amicus* Professor Richardson fears teaching controversial facts, like the existence of Black plantation owners and slaveholders in the American Antebellum South, because they may undermine narratives of "minoritization" and not be "culturally affirming." *See Competencies and Criteria* 3–5, ER-131–33; *Glossary* 8. He similarly fears asking his history students to contrast Booker T. Washington's views with W.E.B. DuBois's, and Martin Luther King, Jr.'s with Malcolm X's, because their views on the role of race in society do not

15

match California's. *See Competencies and Criteria* 4–5, ER-132–33; *Glossary* 2 (denouncing color blindness).

*Amici* Blanken and de Morales usually assure their chemistry students that they will treat them equally and grade them based solely on their in-class achievement. But under the DEIA Regulations, they fear emphasizing "merit" will lead to their being accused of "protect[ing] White Privilege under the guise of standards" and "uphold[ing] race-based structural inequality." *Glossary* 7.

Additionally, in Professors Blanken's and de Morales's pedagogical and professional judgments, DEIA principles have no place in chemistry courses because they are not relevant. But if they continue teaching the history of chemistry by focusing on the scientists who have made the greatest impacts without regard to race or ethnicity, they risk being accused of failing to adopt "culturally responsive practices and a social justice lens" and not being sufficiently "anti-racist." *Model Principles* 6; *Glossary* 1.

*Amici* face increased risk they will be denied a salary increase, disciplined, or even fired for "fail[ing] to recognize systemic . . . racism," "perpetuat[ing] existing racial inequities," not "promot[ing] . . . race-

16

conscious[ness]" with sufficient vigor, or not "participating in DEI groups, committees, or community activities that promote systemic and cultural change to close equity gaps." *Competencies and Criteria* 4–5, ER-132–33; *Glossary* 1–2. They face these consequences not because they failed to impart critical course material to their students, but because they insufficiently echoed the state's preferred viewpoint on hotly debated issues of racial justice.

## II.    The DEIA Regulations Violate the First Amendment.

Unless the Court steps in and issues a preliminary injunction against the DEIA Regulations and Implementation Guidelines, Professor Johnson, *amici*, and tens of thousands of their colleagues across California will be chilled from assigning key course materials, encouraging vigorous discussion on controversial topics, and sharing their views on DEIA issues. That is no way to run a public college, and it is incompatible with the First Amendment.

### A.    The DEIA Regulations Infringe on Professors' Vital Interests in Freedom of Speech and Academic Freedom.

The DEIA Regulations prevent professors from teaching as their convictions, studies, and pedagogical judgments dictate. Indeed, they both compel professors to express certain state-approved viewpoints and

17

blatantly discriminate against other viewpoints chilling professors from expressing them. Viewpoint discrimination is an "egregious form of content discrimination" that is a particularly "blatant" First Amendment violation. *See Rosenberger v. Univ. of Va.*, 515 U.S. 819, 829 (1995). That cloud of censorship violates the First Amendment. *See Demers v. Austin,* 746 F.3d 402, 412 (9th Cir. 2014).

The "vigilant protection of constitutional freedoms is nowhere more vital than in the community of American" colleges and universities. *Shelton v. Tucker*, 364 U.S. 479, 487 (1960). Indeed, "safeguarding academic freedom . . . is of transcendent value." *Keyishian*, 385 U.S. at 603. As a result, the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Id.* Public colleges and universities "do not have a license to act as classroom thought police." *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021).

The First Amendment protects the right of faculty members to teach diverse viewpoints in the classroom and of students to be exposed to diverse opinions. *See Demers*, 746 F.3d at 406 (concluding the First Amendment protects "speech related to scholarship and teaching"). Indeed, "[t]he Constitution embraces . . . a heated exchange of views,

18

even (perhaps especially) when they concern sensitive topics like race, where the risk of conflict and insult is high." *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010). The First Amendment protects teaching and presenting viewpoints that, "however repugnant," are "germane to the classroom subject matter. *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 683 (6th Cir. 2001); *see also Rodriguez*, 605 F.3d at 708 ("The right to provoke, offend and shock lies at the core of the First Amendment.").

Our country's students must have "wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather) than through any kind of authoritative selection.'" *Keyishian*, 385 U.S. at 603. Accordingly, the government may not "force professors to avoid controversial viewpoints," *Meriwether*, 992 F.3d at 507, nor "impose its own orthodoxy of viewpoint about the content . . . allowed within university classrooms," *Pernell v. Fla. Bd. of Govs. of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1273 (N.D. Fla. 2022) (granting preliminary injunction against Florida's Stop WOKE Act), *stay pending appeal denied*, No. 22-13992-J, 2023 WL 2543659 (11th Cir. Mar. 16, 2023), *and appeal argued*, No. 22-13992 (11th Cir. June 17, 2024).

19

But that is exactly what the DEIA Regulations do: They require faculty to endorse the State's positions on DEIA. Professors have no choice but to affirm a "race-conscious and intersectional" viewpoint in their lessons and course materials, even if they strongly support a color-blind approach. *Competencies and Criteria* 3–5, ER-131–33. They must adjust their language "from a colonized mindset to an equity mindset." *Model Principles* 3. And they must "shift to a collectivism perspective" from "an individualist perspective." *Id.* at 6.

Forcing faculty to "demonstrate" their commitment to the government's views on concepts like "anti-racism" and "intersectionality"—ideas hotly debated in academia and amongst the general public—is no different than requiring them to embrace a free-market or Marxist economic perspective, or champion an isolationist or interventionist foreign policy. *See Keyishian*, 385 U.S. at 603. The First Amendment, however, prevents the government from "act[ing] as classroom thought police" and picking and choosing which opinions professors must air. *Meriwether*, 992 F.3d at 507.

The DEIA Regulations echo the unconstitutional loyalty oaths of the McCarthy era by requiring faculty to "demonstrate" their

20

commitment to the government's views on DEIA. Faculty must endorse the government's views related to race, gender, or other identity characteristics. Loyalty oaths were unlawful then, *Keyishian*, 385 U.S. at 603, and remain unlawful now, *Cole v. Richardson*, 405 U.S. 676, 680 (1972) (listing cases declaring that governments may not "condition employment on taking oaths that impinge on rights guaranteed by the First and Fourteenth Amendments"). "[C]onditioning [employment] on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78 (1990). This is especially true in higher education given the importance of ensuring that colleges and universities remain places where diverse ideas are expressed and debated. *Shelton*, 364 U.S. at 487.

The DEIA Regulations not only tell professors what they *have* to say, but also govern what professors *cannot* say. Professors must avoid material contradicting the government's viewpoint, lest they inflict "curricular trauma." *Model Principles* 4. They therefore cannot present arguments or assign materials promoting a contrary "lens" like "color-blindness" rather than "race-consciousness," or "equality" rather than

"equity." But "[g]iving offense is a viewpoint," and the government cannot impose censorship to avoid offense, even if it uses the hyperbolic label of "curricular trauma." *Matal v. Tam*, 582 U.S. 218, 243 (2017); *Rodriguez*, 605 F.3d at 708 ("[I]t is axiomatic that the government may not silence speech because the ideas it promotes are thought to be offensive."). Therefore, through both compulsion and prohibition, the DEIA Regulations chill vital classroom speech.

### B.    The DEIA Regulations Are Unconstitutional Under Strict Scrutiny.

Because the DEIA regulations discriminate based on viewpoint and compel professors to endorse the State's prescribed viewpoint, they are subject to strict scrutiny. *See Rosenberger*, 515 U.S. at 829 (explaining that viewpoint discrimination is an "egregious form of content discrimination" that is a particularly "blatant" First Amendment violation and therefore subject to strict scrutiny); *Nat'l Inst. of Family & Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 766 (2018) (explaining that laws compelling speech are subject to strict scrutiny because they "plainly alte[r] the content of . . . speech").

Under strict scrutiny, the State must prove that the DEIA Regulations are narrowly tailored to further a compelling government

interest. *NIFLA*, 585 U.S. at 766. Here, it has no compelling interest in mandating ideological conformity in pursuit of "more equitable outcomes" for students. Chancellor's Memo 1, ER-137; *accord* Cal. Code Regs. tit. 5, § 53605(a). The Supreme Court held in *Bakke* that policies designed to remedy unequal racial outcomes or "societal discrimination," instead of concrete instances of racial discrimination, is "discrimination for its own sake" and does not further a compelling interest. *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 307 (1978). California similarly cannot justify its viewpoint discrimination with a professed "desire to protect the listener" from "curricular trauma." *See McCauley v. Univ of V.I.*, 618 F.3d 232, 248–49 (3d Cir. 2010) (striking down university's speech policy barring "offensive" signs on campus); *see also Papish v. Bd. of Curators of Univ. of Mo.*, 410 U.S. 667, 670 (1973) (holding campus speech cannot be silenced based on "conventions of decency").

The DEIA Regulations are also not narrowly tailored and are not the least restrictive means of satisfying any state interest in the inclusion and fair treatment of students. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1025 (9th Cir. 2009) (explaining a law fails narrow tailoring when there are "obvious alternatives that would achieve

the same objectives with less restriction of speech"). California can further its interest in diversity and inclusion in ways that keep academic freedom intact, like communicating its DEIA views directly to students without forcing professors to act as intermediaries. *NIFLA*, 585 U.S. at 775 (finding strict scrutiny not satisfied because the government could itself conduct "a public-information campaign").

### C.     The DEIA Regulations Are Unconstitutional Under the *NTEU* Test.

Alternatively, because the DEIA Regulations impose "blanket requirement[s]" that preemptively restrict how faculty exercise their constitutionally protected academic freedom, they are subject to the "heavier burden" the Supreme Court has imposed on "prior restraints" on public employee speech. *United States v. Nat'l Treasury Emps. Union* (*NTEU*), 513 U.S. 454, 467 (1995).

In *NTEU*, the Supreme Court distinguished between "a post hoc analysis of one employee's speech and its impact on that employee's public responsibilities" and an analysis of a "wholesale deterrent to a broad category of expression by a massive number of potential speakers." *Id.*; *accord Janus v. Am. Fed'n of State, Cnty., & Mun. Emps, Council 31*, 585 U.S. 878, 907 (2018) (explaining the *NTEU* test applies to policies

that broadly impact employee speech). The latter constitutes a "prior restraint." *Barone v. City of Springfield*, 902 F.3d 1091, 1105 (9th Cir. 2018). Because a prior restraint on employee speech "chills potential speech before it happens," the government "must shoulder a heavier burden" to justify its existence. *Moonin v. Tice*, 868 F.3d 853, 861 (9th Cir. 2017); *accord Janus*, 585 U.S. at 907.

Under this heavier burden, a public employer must "show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *NTEU*, 513 U.S. at 455 (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 571 (1968)); *see also Progressive Democrats for Soc. Just. v. Bonta*, 73 F.4th 1118, 1123 (9th Cir. 2023). To meet this "heavy" burden, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *NTEU*, 513 U.S. at 475 (internal quotation marks omitted).

This heightened standard applies to the DEIA Regulations because they apply broadly, compelling faculty to embrace the prescribed orthodoxy and prohibiting their constitutionally protected speech. They apply to all faculty regardless of discipline, pedagogical experience, student preference, or departmental pedagogical judgment.

The State cannot satisfy its "heav[y] burden" under *NTEU*. 513 U.S. at 475. America's interest in free inquiry and debate on campus vastly outweighs any purported harm to students caused by exposure to uncomfortable ideas. Exposure to different and sometimes distressing opinions is the *point* of a good college education. Banning protected expression in the classroom also fails to "alleviate" any negative DEIA impact "in a direct and material way." *NTEU*, 513 U.S. at 475. Stifling viewpoint diversity in the classroom does not directly and materially address the lack of racial diversity or unequal or inequitable educational outcomes for minoritized students—it merely silences discussion about how to best address those problems. The DEIA Regulations are therefore unconstitutional regardless of whether the Court applies strict scrutiny or the *NTEU* test.

26

### D.    The DEIA Regulations Are Unconstitutionally Vague.

The DEIA Regulations are also unconstitutionally void for vagueness. A government regulation of speech can be "impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). And policies regulating speech like the DEIA Regulations must provide an even "greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

Here, the DEIA Regulations (1) fail to provide sufficient notice to faculty about what they can and cannot teach and (2) lack limiting principles to constrain the application of their censorious terms to speech falling outside First Amendment protection.

Ideologically loaded terms with abstract requirements, like using "a race-conscious and intersectional lens" do not give faculty adequate guidance to know whether their instruction will satisfy the DEIA Regulations' requirements. The DEIA Regulations leave key terms like "colonized mindset," "individualist perspective," and "curricular trauma"

27

undefined, leaving professors guessing whether their lessons are demonstrating sufficient fealty to the State's preferred views. *Model Principles* 3–4, 6.

The DEIA Regulations likewise invite arbitrary and discriminatory enforcement because the administrators charged with evaluating faculty performance must rely on and use their subjective interpretation of these undefined, key terms.

Consider also the fact the DEIA Regulations require professors to espouse views which are "equity minded." *DEIA Glossary* 5. Professors' livelihood now depends on whether a government bureaucrat believes their views and proposed policies are "equity minded." But as the Supreme Court explained, "[p]eople often label as [racist] ideas which they oppose." *Elfbrandt v. Russell*, 384 U.S. 11, 16 (1966) (striking down an anti-communist loyalty oath that could penalize professors for participating in disfavored conferences or seminars).

The DEIA Regulations fall short of the "great[] precision and specificity" required when First Amendment rights are at stake. *Adamian v. Jacobsen*, 523 F.2d 929, 932 (9th Cir. 1975). The DEIA Regulations leave professors guessing how to ensure their lessons meet

28

the government's requirements, and allow administrators to wield standardless and undefined language to police unpopular speech. That is no way to protect a college's essential function of a search for truth and haven for open inquiry, and it is repugnant to the First Amendment.

### III. California's Actions Are Part of an Alarming Trend Towards Suppressing Disfavored Faculty Speech, and the Court Must Step in to Protect Academic Freedom.

California's DEIA Regulations are part of a recent spate of efforts across the country to force college faculty to embrace the government's preferred viewpoints on DEIA while silencing dissenting voices.

Since 2021, 13 bills banning disfavored viewpoints from classroom discussion and curricula in public institutions of higher education have become law, and five non-legislative regulatory actions (including the DEIA Regulations) impose similar bans.[9] Most of these bans stifle pro-

---

[9] *Index of Educational Gag Orders*, PEN Am., https://airtable.com/appg59iDuPhlLPPFp/shrtwubfBUo2tuHyO/tbl49yo d7l01o0TCk/viw6VOxb6SUYd5nXM (last updated Oct. 1, 2024); *see also America's Censored Classrooms 2024*, PEN Am. (Oct. 8, 2024), https://pen.org/report/americas-censored-classrooms-2024; *DEI in Higher Ed: When It's Constitutional and When It's Not*, FIRE, https://www.thefire.org/research-learn/dei-higher-ed-when-its-constitutional-and-when-its-not (last visited Nov. 1, 2024) ("In 2023 alone, [10 states] introduced either legislation or executive orders seeking to ban so-called 'divisive concepts' from classroom discussion and curricula in their colleges and universities.").

DEI speech, but the DEIA Regulations are merely the other side of the same coin.

For example, the DEIA Regulations mirror the unconstitutional edicts of Florida's currently enjoined Stop WOKE Act. *Pernell*, 641 F. Supp. 3d at 1272–73. Florida banned professors from teaching viewpoints the DEIA Regulations mandate. For instance, a professor *could not* teach the view that "merit" or "colorblindness" are racist ideas, Fla. Stat. § 1000.05(4)(a)(8), while the DEIA Regulations force professors to *embrace* this viewpoint, *Glossary* 2, 7. The Northern District of Florida held Florida "cannot impose its own orthodoxy of viewpoint about the content it allowed within university classrooms." 641 F. Supp. 3d at 1273.

So too here. California cannot require professors to espouse the views Florida tried to ban. As the *Pernell* court explained, "a viewpoint-discriminatory ban targeting protected in-class speech" is "certainly *not* reasonable," let alone the least restrictive means of addressing racial inequity or discrimination. *Id.*

Now, this Court must step in to "vigilant[ly] protect[]" the "expansive freedoms of speech and thought" in California's community colleges from California's attempt to "cast a pall of orthodoxy over the

30

classroom." *Demers*, 746 F.3d at 411 (quoting *Keyishian*, 385 U.S. at 603, and *Grutter v. Bollinger*, 539 U.S. 306, 329 (2003)). It must protect professors' abilities to expose their students, without fear of reprisal, "to that robust exchange of ideas which discovers truth," *Keyishian*, 385 U.S. at 603, "even (perhaps especially) when [those ideas] concern sensitive topics like race," *Rodriguez*, 605 F.3d at 708, "however repugnant" the State finds them, *Hardy*, 260 F.3d at 683.

If this Court does not step in—if "[t]eachers and students [do not] remain free to inquire, to study and to evaluate, to gain new maturity and understanding" through exposure to worldviews that challenge their own, *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)—then "new discoveries cannot . . . be made," *Keyishian*, 385 U.S. at 603. To protect academic freedom across California, this Court should enjoin the DEIA Regulations.

## CONCLUSION

California's DEIA Regulations conscript community college districts into forcing faculty to embrace the State's preferred views on DEIA. The district court erred by holding otherwise and dismissing Professor Johnson's claims for lack of standing. To protect the free

exchange of ideas on community college campuses in California, this Court should vacate the district court's order and remand with instructions to issue a preliminary injunction against the DEIA Regulations.

Dated: November 6, 2024            /s/ Daniel Ortner

DANIEL ORTNER*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
(215) 717-3473
daniel.ortner@thefire.org

*Counsel of Record

ZACHARY SILVER
CONOR T. FITZPATRICK
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE,
Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
zach.silver@thefire.org
conor.fitzpatrick@thefire.org

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-6008

I am the attorney or self-represented party.

**This brief contains 5749 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s Daniel Ortner **Date** November 6, 2024
*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 6, 2024, an electronic copy of the Brief of *Amici Curiae* Loren Palsgaard, David Richardson, Bill Blanken, and Linda de Morales was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system. The undersigned also certifies all parties in this case are represented by counsel who are registered CM/ECF users and that service of the brief will be accomplished by the CM/ECF system.

Dated: November 6, 2024          /s/ Daniel Ortner
                                                    _____

DANIEL ORTNER*
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
510 Walnut Street, Suite 900
Philadelphia, PA 19106
(215) 717-3473
daniel.ortner@thefire.org

*Counsel of Record*

ZACHARY SILVER
CONOR T. FITZPATRICK
FOUNDATION FOR INDIVIDUAL
  RIGHTS AND EXPRESSION
700 Pennsylvania Avenue SE,
Suite 340
Washington, DC 20003
Telephone: (215) 717-3473
zach.silver@thefire.org
conor.fitzpatrick@thefire.org